**UNITED STATES of America,
Appellee,**

v.

**Edward BLESS, Appellant.**

**No. 328, Docket 33240.**

United States Court of Appeals,
Second Circuit.

Submitted Jan. 7, 1970.

Decided Feb. 6, 1970.

Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, Daniel J. Sullivan and David A. Luttin-

ger, Asst. U. S. Attys. (on the brief), for appellee.

Edward Bless, pro se.

Before LUMBARD, Chief Judge, FRIENDLY, Circuit Judge, and MANSFIELD, District Judge.*

MANSFIELD, District Judge:

After a five-day jury trial appellant Edward Bless was found guilty on December 1, 1968 of unlawfully selling heroin in violation of 21 U.S.C. §§ 173 and 174 as charged in Count 4 of an indictment naming him, Ralph Febre and Joseph Pego. On December 12, 1968, Bless was sentenced to a seven-year term of imprisonment, which he is presently serving. Although represented by counsel below, he now appeals *pro se*, challenging his conviction on various grounds. For the reasons stated below, we reverse.

The indictment contains five counts, the first of which charges Pego alone with a sale on February 14, 1967, of 14 grams of heroin. Counts 2 and 3 charge Pego and Febre with heroin sales made on February 20, 1967, and March 8, 1967; Count 4 charges all three defendants with a sale on April 6, 1967, of 236 grams of heroin; and Count 5 charges all with a conspiracy to violate §§ 173 and 174.

At the outset of trial Pego pleaded guilty to all five counts. Trial then proceeded on Counts 2 through 5 against Febre and Counts 4 and 5 against Bless. Extensive evidence was offered by the Government as part of its case-in-chief, and received by the court, with respect to the earlier sales of narcotics made by Pego and Febre. It was shown that on February 14, 1967, Special Agent Cook of the Federal Bureau of Narcotics was introduced to Pego by an informant in the vicinity of 170th Street and Jerome Avenue, the Bronx, and made a purchase of one-half ounce of heroin for $700, $650 of which was paid and the balance to be paid later. Further negotiations followed on February 20, 1967, with agents conducting surveillance of Pego, who met with Febre in the Bat Cave Bar & Grill, following which Pego delivered an ounce of heroin to Cook for an agreed price of $1,400, receiving $1,250 on account with a balance due of $200, including the $50 owed on the first purchase. On February 23, 1967, Cook paid the $200 to Pego who immediately handed a wad of money to Febre.

When Agent Cook complained about the quality of the heroin that had been purchased on February 20, Pego offered to sell Cook an ounce of pure heroin on a moneyback guarantee basis, and on March 8, 1967, he entered an apartment rented by Febre's brother at 1551 Walton Avenue, exited with Febre, and delivered a sample of the heroin to Agent Cook.

On March 13, 1967, Agent Cook and Pego negotiated for the purchase from Pego of a quarter kilogram of heroin for $8,700, following which Pego went to the Febre apartment at 1551 Walton Avenue and returned to report that his people were unable to obtain the drugs that evening. He suggested that Agent Cook wait a few weeks. On April 4, 1967, Cook and Pego arranged for the purchase on the following night, April 5, of a quarter kilogram of heroin.

There was no proof of Bless' involvement in any of the foregoing negotiations or sales. His participation did not commence until April 5, 1967. On that evening, pursuant to the arrangements made on April 4, Pego and Agent Cook met at the Port Authority bus station, 178th Street and Broadway, where Cook waited while Pego went to obtain the quarter kilogram of heroin to be sold to Cook. Pego then proceeded to the Bat Cave Bar & Grill, a few blocks away, joined Febre and Bless at the bar, and advised Febre that "the Negro" (Agent Cook) wanted "a quarter." Thereupon Febre turned to Bless and inquired if Bless "could handle it." Bless said that he could and that it would take about 45 minutes. Bless left the bar and drove

* Of the Southern District of New York, sitting by designation.

away, leaving Pego and Febre together at the bar. There followed a conversation between Pego and Febre in which Febre said that "things were going to be much better now that Willy was dead because Eddie was a much better guy to get along with." At 9:45 P.M. Bless reappeared and advised Pego and Febre "It can't be done tonight. It has to be tomorrow." Pego left the bar and told Agent Cook that he had spoken with his source of supply who advised that the delivery could not be made until the following day. On April 6, 1967, Pego delivered the quarter kilogram of heroin to Agent Cook and was arrested.

Although there was no proof that Bless had participated in any of the narcotics sales or negotiations prior to April 5, the trial court, over the objections of Bless' counsel, admitted "subject to connection" the evidence of the earlier Cook-Pego-Febre negotiations and sales as proof under Count 5, which charged all defendants with participation in a conspiracy to violate §§ 173 and 174 beginning on or about January 1, 1967. In admitting the evidence against Bless "subject to connection" Judge Metzner stated to the jury "I will further instruct you as to this later on in the trial" (Tr. 56).

At the close of the Government's case the court denied Bless' motion for a severance of himself from Count 4 but granted his motion for severance of Count 5 on the ground that instead of proving the one conspiracy alleged in Count 5, the proof revealed two conspiracies, an earlier one between Pego and Febre, and a later one, beginning on April 4 or 5, 1967, when Bless for the first time became a participant in a narcotics sale. In so ruling the court leaned heavily upon the April 5 conversation between Pego and Febre regarding "Willy" and "Eddie," which implied that "Eddie" [Bless] had not been the supplier for the earlier sales. There was later proof that a friend of Bless named "Willy" had died in late March or April 1967 (Tr. 376-377), which postdated the earlier transactions.

In severing Bless from Count 5 Judge Metzner, out of the jury's presence, sustained Bless' objection to exhibits relating to earlier narcotics sales (Exs. 3, 6 and 6A) and granted Bless' motion that "insofar as the defendant Bless is concerned * * * there be stricken, or the jury be instructed to disregard, any evidence of events prior to April 4, 1967 in their consideration of the guilt or innocence of the defendant Bless. * * *" (Tr. 298). Thus the court decided that Bless was not sufficiently connected with the earlier narcotics sales to permit evidence of them to be considered against him. However, the jury was never so instructed.

In his summation Bless' counsel stated:

"He [Bless] is not chargeable in any way whatsoever, and His Honor will instruct you on this, with the events of February 20th, with the events of February 23, with whatever transpired in March. That is not his concern. So far as your deliberations concerning Edward Bless, it is as if you never heard that" (Tr. 528).

No such instruction was given. Although Judge Metzner instructed the jurors that the guilt or innocence of each defendant was to be determined separately, he also charged that in their consideration of the case against Febre and Bless evidence of "Pego's activities or conversations" was "relevant to the extent that you believe that testimony and find it connected to the counts that you will consider" (Tr. 600), and that with respect to the charge against Febre, Bless and Pego in Count 4 "each is chargeable with the acts and statements of the other, which may be considered by you in determining the four elements of the crime" (Tr. 611). In discussing the Count 5 conspiracy charge, which remained against Febre, the court also read to the jury overt act No. 3 to the effect that on April 5, 1967, in pursuance of the conspiracy, Bless, Febre and Pego met at 4271 Broadway, the address of the Bat Cave Bar & Grill (Tr. 617).

The foregoing statements not only failed to exclude the evidence of the earlier transactions from consideration by the jury against Bless, but could well have led the jurors to believe that they were entitled to consider it against him. Recognizing this his counsel, before the case was submitted to the jury, excepted to the charge as follows:

"Lastly, your Honor, I had in my summation called the specific attention of the jury to the fact that your Honor would probably charge that in a consideration of the guilt of the defendant Bless their attention would be devoted solely to the events in and about April 5, 1967 and they are not to consider any of the other evidence which has been taken subject to connection. I wonder if I might request at this time that your Honor charge the jury to that general effect because you did admit evidence subject to connection" (Tr. 627).

The requested instruction was denied.

In view of the nature of the charges, a joint trial was permissible and the court properly refused to sever Bless from Count 4.[1] Schaffer v. United States, 362 U.S. 511, 514, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); United States v. Aiken, 373 F.2d 294, 299 (2d Cir.), cert. denied, 389 U.S. 833, 88 S.Ct. 32, 19 L.Ed.2d 93 (1967); United States v. Kaufman, 311 F.2d 695, 698 (2d Cir. 1963). Although not entitled to a severance, Bless was entitled to have the jury instructed that in determining his guilt or innocence on the remaining charge against him, it should limit itself to proof of the events postdating April 4, 1967, and not give any consideration or weight to the extensive evidence of the earlier February-March narcotics negotiations and sales on the part of his co-defendants. United States v. Light, 394 F.2d 908, 911 (2d Cir.1968); United States v. Kelly, 349 F.2d 720, 756–757

(2d Cir.1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966); United States v. Agueci, 310 F.2d 817, 829 (2d Cir.1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). Since Judge Metzner, at an early point in the trial, stated that he would give such a charge (Tr. 298–299), it may well be that he mistakenly assumed that he had done so when he refused Bless' repeated request at the close of the trial.

Absent an instruction to the jury that the extensive evidence of the earlier narcotics sales was not to be considered in determining Bless' guilt or innocence of the charge that he made the April 6th sale, the jury may have concluded that Bless was somehow or other connected with the earlier sales and therefore guilty of the April 6th sale, even though there is no proof that he knew of or participated in the earlier dealings. Accordingly we conclude that the failure to give the requested instruction was sufficiently prejudicial to entitle Bless to a new trial.

We recognize that the evidence of the earlier events would in the joint trial have been before the jury for consideration against Febre, and that the jurors would have faced the difficult task of putting it out of their minds in considering the case against Bless. Cf. Krulewitch v. United States, 336 U.S. 440, 453–454, 69 S.Ct. 716, 93 L.Ed. 790 (1948) (Jackson, J., concurring); Kotteakos v. United States, 328 U.S. 750, 774, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). However, it does not appear that the jury would have been unable to have followed such an instruction, unless we are to downgrade the protective function of instructions as an essential instrument in the conduct of a joint criminal trial. Tillman v. United States, 406 F.2d 930, 935 (5th Cir.), vacated as to one defendant on other grounds, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969); Pe-

[1] In the exercise of his discretion, Judge Metzner could have denied a severance as to Count 5, United States v. Crosby, 294 F.2d 928, 945 (2d Cir. 1961), leaving it to the jury, upon appropriate instructions, to decide whether there was more than one conspiracy. United States v. Varelli, 407 F.2d 735 (7th Cir. 1969).

terson v. United States, 344 F.2d 419, 422 (5th Cir.1965); Gorin v. United States, 313 F.2d 641, 647 (1st Cir.1963), cert. denied, 379 U.S. 971, 85 S.Ct. 669, 13 L.Ed.2d 563 (1965); United States v. Stromberg, 268 F.2d 256, 264–265 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959); United States v. Kahaner, 203 F.Supp. 78, 81–82 (S.D.N.Y.1962), aff'd, 317 F.2d 459 (2d Cir.), cert. denied, Keogh v. United States, 375 U.S. 836, 84 S.Ct. 74, 11 L. Ed.2d 65 (1963). The error cannot therefore be classified as harmless.

There is no merit to Bless' other points. His attack upon the presumption of knowledge of illegal importation arising from possession of heroin has been laid to rest by the Supreme Court's recent decision in Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L. Ed.2d 610 (Jan. 20, 1970). See also United States v. Febre, 425 F.2d 107 (Jan. 8, 1970).

For the foregoing reasons the judgment is reversed and the case remanded for a new trial as to Bless.