**UNITED STATES of America,
Appellee,**

v.

**John CALARCO, Frank Gilfone and
Teddia Riviello, Appellants.**

**Nos. 144, 145 and 509,
Dockets 33522-3, and 34385.**

United States Court of Appeals,
Second Circuit.

Argued March 5, 1970.

Decided April 16, 1970.

Dooling, J., dissented in part.

**658**

Wellington A. Newcomb, New York City, for appellant Calarco.

Baldwin Maull, Jr., New York City, for appellant Gilfone.

Samuel D. Bozza, Newark, N. J., for appellant Riviello.

Jay Gold, Asst. U. S. Atty., Southern District of New York (Whitney North Seymour, Jr., U. S. Atty., and Peter L. Zimroth, Asst. U. S. Atty., Southern District of New York, on the brief), for appellee.

Before LUMBARD, Chief Judge, ANDERSON, Circuit Judge, and DOOLING,* District Judge.

ANDERSON, Circuit Judge.

John Calarco, Frank Gilfone and Teddia Riviello appeal from their convictions upon jury verdicts of guilty of conspiring to steal a truck containing an interstate shipment of merchandise and of the substantive offense of stealing the truck, in violation of 18 U.S.C. §§ 371, 659 and 2. We affirm.

There were eight co-conspirators named in the indictment, among whom there was a confessed hijacker of wide experience, named Roland Warren, who was the chief witness for the Government. Of the others, three entered guilty pleas before trial, and the appeal of a fourth, who was convicted with the appellants Calarco, Gilfone and Riviello, has been dismissed.

There was evidence from which the jury could find the following facts: On December 14, 1966, Warren met with David Tronco and Philip Garretson in a bar in Newark to discuss hijacking a truck which made a regular journey from a New Jersey railroad yard into Manhattan, loaded with television sets and phonographs. Tronco said he knew "people in Jersey City" who would be interested in buying the shipment; and he telephoned the appellant Calarco, who joined the other three at the bar. Calarco then asked the others to accompany him across town to talk to "the people that was going to get the load of televisions."

Calarco, Warren, Tronco and Garretson joined James Matthews, who had been waiting outside the bar in Tronco's Thunderbird automobile, and drove to the Democrat Club, another bar. Calarco went inside alone, explaining that he was going to talk to "the buyer." After about an hour, Tronco went to get Calarco, who came out and told the other four in the car that he and they would follow "these people"—indicating two individuals emerging from the Democrat Club. Calarco told the others he "wanted to show [them] where to bring the truck" after the hijacking.

Those in the Thunderbird then followed a Buick, driven by the appellant Riviello, who was accompanied by an unidentified man, to a location on the McCarter Highway, near Fourth Avenue in Newark. Both cars stopped there and turned off their lights, with the Thunderbird directly behind the Buick. Calarco got out, went over to the Buick, and spoke with Riviello for about fifteen minutes. As Calarco was returning, a police patrol car was approaching, but he got back into the Thunderbird and said, "When you get the truck this is where you are going to bring it, bring it here." At that point, the police arrived and re-

---

* Of the Eastern District of New York, sitting by designation.

quired the occupants of both cars to identify themselves. Riviello explained to an officer that he was just giving the people in the other car directions to Jersey City, and he departed. Tronco and Warren were arrested when it was discovered that traffic warrants were outstanding against them. They were shortly released on bail provided by Calarco, who told Warren that the money had come from Riviello.

Notwithstanding this unforeseen interruption, members of the group reassembled early on the morning of December 16, at Calarco's apartment in Jersey City, to make detailed plans for the hijacking. Those present were Calarco, Warren, Garretson, Matthews, Tronco, and a new addition to the group, John Orangio. It was here agreed that Tronco would approach the driver of the target truck when he boarded the ferry to Manhattan sometime around 5 a. m. that same day and ask for a ride. He was further instructed to draw a gun, provided by Calarco, when the truck had disembarked and reached a point some five blocks away from the ferry in Manhattan, and at that time to order the driver out of the cab. The plan then called for another member of the group to pull alongside the truck in a car, stolen for this purpose, and to take the driver in it to some suitably distant point before releasing him. In the meantime, Warren was to arrive in still another car alongside the stolen truck and drive it to the Tunnel Diner outside the Holland Tunnel in Jersey City, where Calarco would meet him and give further instructions. Calarco gave one of the members of the group the phone number of a motel room in which he, Calarco, would be waiting for notification that Warren was on his way to the diner with the truck.

Tronco succeeded in hitching a ride with the truck driver, one Calanders Cherry; but from that point on, everything went wrong for the hijackers. Matthews was left behind in the washroom of a New Jersey diner when his companions and the ferry suddenly departed. Tronco then pulled the gun on Cherry when the truck was barely out of sight of the Manhattan ferry slip. Rather than surrender the truck, Cherry put up a fight, which delayed things until Garretson arrived in the stolen car and helped to subdue him. While Tronco and Garretson drove Cherry to Yonkers, members of the group following in another car approached the truck. They decided, however, that completion of the robbery had become impossible because several construction workers were standing near the prematurely-seized truck. They, therefore, simply left it standing on West Street, with its engine running. One of them called Calarco to tell him the news, and they returned to New Jersey.

When Warren got back to the diner, he found Calarco, the appellant Gilfone, and an unidentified man waiting outside. The four of them and Orangio drove back to Manhattan to see if the truck might yet be driven away; but when they found a number of people milling around it, they gave up.

Calarco and Warren went back to the Democrat Club in Newark, and Calarco went inside for a few moments. When he came out, he told Warren that Tronco, following his abduction of Cherry, got in touch with Riviello and learned that his premature action had frustrated the attempt to get the truck back to New Jersey. Tronco then said to Riviello that he would finish the job himself, and meet "those two guys" at a new rendezvous point on Route 46. Calarco told Warren that the two of them must go to the unloading place on Route 46 to warn Gilfone, and the unidentified person with him, that a police trap was now suspected. Meanwhile, Tronco and Garretson had returned from Yonkers to the truck, which, after several hours, was still parked on West Street with its engine running.

The police, whom Cherry had called from Yonkers, found the truck and staked out the area around it. They apparently saw Tronco approach the truck

around 9 a. m., but when a detective went after him, he fled. Garretson came to Tronco's rescue in the stolen automobile, and the two of them made their escape down the street as the detective fired five shots into the car. But they were not destined to drive very far. No sooner had they eluded the detective than Garretson crashed the getaway car into another automobile while attempting to avoid a double-parked truck a block and one-half away. Both Garretson and Tronco were arrested as they attempted to flee on foot.

Riviello and Calarco, after their arrest, both waived their rights to remain silent. They were shown photographs of some of the others who were being held in connection with the offense, but Riviello denied knowing Calarco, and Calarco denied knowing either Riviello, Warren, Garretson or Gilfone.

All of those indicted who did not plead guilty were convicted after being tried; and Calarco and Riviello were each sentenced to concurrent terms of five years for conspiracy and ten years on conviction of the substantive theft offense. Gilfone received concurrent prison terms of four years on each of the two counts.

Riviello argues in his appeal that the evidence was insufficient to establish either his participation in the conspiracy or that he aided and abetted the theft itself. The only connection shown between these events and him, he alleges, was his "mere presence" with the others at the McCarter Highway site. He claims that all the other testimony involving him consisted only of hearsay statements by various conspirators.

As has been many times stated, the rule is that before the jury may be permitted to consider other conspirators' hearsay utterances in furtherance of the conspiracy as a means of determining a particular defendant's guilt beyond a reasonable doubt, the trial judge must first conclude from all the evidence that the defendant in question has been shown to be a member of that conspiracy "by a fair preponderance of the evidence independent of the hearsay utterances." United States v. Geaney, 417 F.2d 1116 (2 Cir. Nov. 6, 1969). The non-hearsay evidence linking Riviello to the conspiracy in this case included not just his "mere presence" at a certain site, but also his acts of leading the others from the Democrat Club to that location and there relaying instructions to them through Calarco.[1] This was sufficient for the trial judge to conclude that Riviello was a participant in the conspiracy and that hearsay statements of his co-conspirators in furtherance of the conspiracy were admissible against him. United States v. Nuccio, 373 F.2d 168, 173–174 (2 Cir.), cert. denied, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967).

All of the appellants claim that the trial court committed prejudicial error in permitting the Government to introduce police file photographs of them in evidence. Each appellant's photograph was used as evidence against some other appellant, in connection with testimony that Calarco and Riviello evidenced "guilty consciousness" when they denied knowing various co-conspirators at the time of their arrest. See United

---

1. Warren testified that Calarco walked back to the Thunderbird after holding a conversation with Riviello, in Warren's sight and only a few feet away, and that Calarco then said "this is where you are going to bring [the truck]." This testimony was not hearsay as to Riviello, because Warren's testimony about Calarco's statement was not offered in this context to show the truth of either Calarco's suggestion that the McCarter Highway location was a suitable one for delivery of the truck or Warren's own assertion that Calarco's statement concerned delivery of a truck. The fact that Riviello gave an instruction relayed to the other conspirators at this point in their planning of the hijacking was relevant and admissible independent of its contents, as a nonhearsay "verbal act." See United States v. Lopez, 420 F.2d 313, 318 (2 Cir. Dec. 1, 1969) ; United States v. Geaney, supra, 417 F.2d p. 1120, fn. 3 and 4.

States v. Farina, 218 F.2d 62 (2 Cir. 1954). Thus Calarco's photograph was introduced against Riviello, whose picture in turn was put in evidence along with those of Gilfone and others against Calarco. In each instance, numbers in the corners of the file photographs had been cut off and the backs of the pictures had been covered with tape to block out written material. Nevertheless, the appellants contend the effect of the introduction of several such photographs was to disclose to the jury that all the defendants pictured and the co-conspirator, who testified as the Government's chief witness as well, had previously been convicted of other crimes.

We conclude, however, that introduction of these file photographs, as modified, was not likely to cause the jury to infer the existence of prior criminal convictions. It is much more likely that the jury assumed they were taken by the police when the appellants were arrested on the charges for which they were then being tried.[2] The photographs in question, in the form in which the jury saw them, did not include the overt references to specific prisons and dates of incarceration which were apparent in the "mug shots" whose introduction was held error in United States v. Harman, 349 F.2d 316 (4 Cir. 1965). Nor were they introduced to buttress and improperly color identification testimony naming the persons pictured as the perpetrators of the crimes for which they were then being tried, as was held to be the case in Barnes v. United States, 124 U. S.App.D.C. 318, 365 F.2d 509 (1966).[3] Cf. United States v. Reed, 376 F.2d 226, 228 (7 Cir. 1967).

The court rejected Riviello's request to charge that "Where the proof adduced by the Government is as consistent with innocence as with guilt, the Government had failed to make out a case," but it adequately instructed the jury concerning the prosecution's burden of proof and the defendants' presumption of innocence elsewhere in its charge. It was not required to give the requested charge stating that the jury must determine each defendant's membership in the conspiracy on the evidence independent of acts and statements of other conspirators. United States v. Nuccio, *supra*, 373 F.2d at 173. Otherwise the appellants claimed no error in the charge and no exception was taken to it at the trial.

Although the appellant Gilfone complains that he was deprived of his right to counsel because the court failed to ask him whether he consented to being represented at trial by the attorney whom he and Riviello had jointly retained, the court had no such affirmative duty. A conflict of interest must be shown as a foundation for any claim that joint representation was a deprivation of this constitutional right, United States v. Paz-Sierra, 367 F.2d 930, 932–933 (2 Cir. 1966), cert. denied, 386 U.S. 935, 87 S.Ct. 962, 17 L.Ed.2d 807 (1967), and Gilfone has suggested none.

The judgments are affirmed.

DOOLING, District Judge (dissenting in part).

It would appear that Riviello is entitled to a new trial.

When the Government rested, Riviello strenuously argued for acquittal on the

---

2. Calarco now contends that no such inference could have been drawn in his case because the file picture was taken when he was some ten years or more younger than his age at trial and showed a difference in his hairline. This objection to the photograph, which was not raised at the trial, overlooks the fact that the jury might have considered a receded hairline adequately explained by the nearly three years which had intervened between Calarco's arrest in 1966 and this trial in 1969.

3. The photographs in question were introduced to establish Calarco's and Riviello's denial of acquaintance with co-conspirators, which was not itself identification testimony. And there was no gratuitous introduction by the prosecution of file photographs, for this or any other purpose, duplicating other, less ambiguous pictures of defendants already in evidence, such as those which marked the *Barnes* case.

ground that the evidence *aliunde* and independent of hearsay declarations about him made in his absence was insufficient to warrant submission of the case to the jury (170a–174a). The trial judge ruled that under the doctrine of United States v. Nuccio, 373 F.2d 168 (2 Cir.), the evidence sufficed (174a). When all parties rested Riviello again moved for acquittal, the trial judge reserved decision, and then charged the jury (176a–187a).

After defining conspiracy as including the element of the defendants' knowingly associating themselves with the conspiracy (200a), the Court charged that if the jury concluded that the conspiracy did exist, it had then to determine separately for each defendant whether he participated in it and did so with knowledge of its unlawful purpose (202a). The court then charged

> "In determining whether or not the defendant knowingly joined the conspiracy you should examine and consider all the evidence in the case, including the acts *and statements* of the defendant under consideration as well as the acts *and statements* of other persons with whom that defendant is alleged to have conspired" (202a–203a, italics supplied)

and the Court then went on to other parts of the charge. Before the jury retired, Riviello's counsel excepted in the following language (220a)

> "I think, your Honor, whether the request is made or not, failed to charge this jury that where a person is sought to become a member of a conspiracy he should be adjudged by his own independent acts or statements that he makes. It is not enough to limit it to only those cases where he knowingly and wilfully joins a conspiracy with knowledge of it. The cases hold that in order to seek one to become a member of a conspiracy it must be done by what he himself says or does aliunde or independent of any declarations or admissions or statements made by an alleged co-conspira-

tor. I spent a great deal of time on that in my summation to the jury and I think, and I think in fairness to Riviello and Gilfone that should be charged."

The Court, however, stated "I believe I have charged exactly in accordance with the prevailing rule in the Second Circuit." The Court, plainly, bowed to the line of cases, given their evidently definitive expression in United States v. Geaney, 1969, 417 F.2d 1116, 1119–1121, that reaches back from United States v. Lopez, 1969, 420 F.2d 313, 317–318; United States v. Tyminski, 1969, 418 F.2d 1060, 1062; United States v. Branker, 1969, 418 F.2d 378, 379–380; United States v. Ragland, 1967, 375 F.2d 471, 476–479 (particularly at 479, headnote number 25); United States v. Nuccio, 373 F.2d 168, 173–174; United States v. Dennis, 1950, 183 F.2d 201, 230–231, aff'd sub nom. Dennis v. United States, 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L. Ed. 1137; United States v. Pugliese, 1945, 153 F.2d 497, 500–501; United States v. Renda, 1932, 56 F.2d 601, 602; VanRiper v. United States, 1926, 13 F. 2d 961, 967–968. The Court did not give Riviello's belated (221a–223a) request No. 39 (228a–229a): it posed an opposite view: that the jury must review the adequacy of the "independent" evidence to implicate a defendant in the conspiracy separately, and may not consider evidence of verbal acts ("hearsay declarations") attributed to and implicating him that took place out of his presence in deciding whether or not the Government has proved the conspiracy and his complicitly beyond a reasonable doubt. The requested charge was based on a charge of Judge Weinfeld in United States v. Galgano, that if the jury found a conspiracy, it had then to determine whether each defendant joined it by evaluating the evidence "without regard to, and independently of, the statements, acts or declarations of others." The requested charge told the jury that out-of-court declarations or admissions received against the persons who made them were received "on a conditional or

tentative basis" with respect to absent defendants "subject to independent proof of the existence of the conspiracy, and such absent defendants' knowing participation in the conspiracy." The requested charge continued:

"In other words, the alleged participation by a defendant in the conspiracy cannot be established against him by the acts and declarations of any of his alleged co-conspirators done or made *in his absence.* A defendant's connection with the conspiracy must be established by independent proof based upon the reasonable inferences to be drawn from such defendant's own actions, his own conduct, his own testimony or declarations, his own connection with the actions and conduct of the other alleged co-conspirators.

"Each defendant's acts and declarations may be evidence of his own connection with the conspiracy and the conspiracy may be proved by the sum total of the independent acts and declarations of all the alleged participants.

"However, once you are satisfied beyond a reasonable doubt that a conspiracy existed and that a defendant on trial was a member of the conspiracy, using the test of independent proof, I have described, then the acts and declarations of any one of the other persons whom you may find was also a member of the conspiracy, made during the pendency of the conspiracy and in furtherance of its objectives

are considered the acts of all of the others, even though they were not present."

As to Judge Weinfeld's charge see United States v. Carminati, 2d Cir. 1957, 247 F.2d 640, 644–645. See in the general context United States v. Elgisser, 2d Cir. 1964, 334 F.2d 103, 107.

The view of the cases from *VanRiper* through *Lopez* is now so deeply rooted in Second Circuit law, that to note a dissent may be futile; indeed, the contrary doctrine has been criticized by some commentators,[1] and the Second Circuit's decisions have been followed elsewhere (see, e. g., Carbo v. United States, 9th Cir. 1963, 314 F.2d 718, 735–738). Although the practice of giving the conditional form of instruction may be fairly widespread, appellate support for the propriety and necessity of the practice is uncertain and to an extent of a negative cast. Cf. Glasser v. United States, 1942, 315 U.S. 60, 74–75, 62 S.Ct. 457, 86 L. Ed. 680; Greer v. United States, 5th Cir. 1943, 134 F.2d 912; Schmeller v. United States, 6th Cir. 1944, 143 F.2d 544, 550–551; United States v. Vida, 6th Cir. 1966, 370 F.2d 759, 766; Commonwealth v. Rogers, 1902, 181 Mass. 184, 192–194, 63 N.E. 421, 425–426.

The admissibility against absent defendants of evidence of "declarations of co-conspirators in furtherance of the conspiracy" depends on whether the words themselves were tools used to effectuate a criminal act. They are not admissible for their narrative content

---

1. Cf. Maguire and Epstein Preliminary Questions of Fact in Determining the Admissibility of Evidence, 1927, 40 Harv. L.Rev. 392, 397, fn. 19, 415–424 (condemning theory that court should rule only preliminarily on admissibility and then "pass the question of admissibility along to the jury for their determination," pages 420–421); Morgan, Functions of Judge and Jury in the Determination of Questions of Fact, 1929, 43 Harv.L.Rev. 165, 176 (to believe jurors will reject heard evidence if unable to find a fact which determines its relevancy "requires a credulity impossible to achieve"; such approach furnishes "the defendant an op-

portunity to entrap an unwary trial judge"); *cf.* Developments in the Law, Criminal Conspiracy, 1959, 72 Harv.L. Rev. 920, 987 (noting that if declarations are thought logically admissible only if independent evidence connects defendant with the conspiracy, yet the evidence is conditionally admitted and the issue passed to the jury, the provisionally admitted evidence may in fact be used to support the *prima facie* case, hearsay thus lifting itself by its own boot straps to the level of competency, and that where that practice prevails, "the requirement of independent evidence is virtually meaningless").

but for their constitutive role—as "verbal acts." The merely narrative utterance is inadmissible, and evidence of a "verbal act" is not received for its spurious value as narrative implicating an absent defendant. If an utterance is a verbal act, its evidentiary significance depends not on its truth or falsity—that is beside the point—but upon its function in the commission of the crime. In some circumstances—and may not the present case be one?—a black lie about the absent defendant's role and orders would be the most efficacious utterance to advance the crime (cf. *Geaney, supra,* 417 F.2d at 1121, fn. 4) and the most damning if treated as competent evidence of the complicity of the absent defendant.

The cases which have evolved to climax in *Geaney,* have not suggested that the declarations are competent evidence of the absent defendant's complicity.[2] They explicitly preserve the idea that the Court must keep the case from the jury unless satisfied that the prosecution has proved participation "by a fair preponderance of the evidence independent of the hearsay utterances." United States v. Geaney, *supra,* 417 F.2d at 1120. *Geaney* is, none the less, pellucid that the jury is not only not to be instructed that it must find from the "independent" evidence beyond a reasonable doubt that the defendant was implicated in the crime before considering the hearsay declarations as part of the total proofs, but that the jury is to be freed affirmatively to consider the hearsay on the issue of the absent defendant's guilt beyond a reasonable doubt (417 F.2d at 1120), to the point, indeed, of using it to "tip the scale" in a case in which the independent evidence might not convince the jury of guilt (ibid). See, e. g., United States v. Bless, 2d Cir. 1970, 422 F.2d 210 at pp. 212–213; United States v. Eskow, 2d Cir. 1970, 422 F.2d 1060 at pp. 1069–1070. The threshold of admissibility is designedly set low enough to accord that advantage to the prosecution.

The present case may now seem at several removes from the context of Bruton v. United States, 1968, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, but underlying *Bruton* is the value put on the defendant's right to confront and to cross-examine his accuser. Riviello could not because Calarco was his accuser; he could not call Calarco to the witness stand, nor meet Calarco's out-of-court imputation without himself testifying. Cf. Douglas v. Alabama, 1965, 380 U.S. 415, 418–419, 85 S.Ct. 1074, 13 L.Ed.2d 934. And in the frame of reference in which *Geaney* fixes the matter, the aim and effect of the procedure are to dilute the reasonable doubt requirement—a due process exaction, Matter of

2. The "multiple hearsay" exception (American Law Institute, Model Code of Evidence, 1942, Rule 530; Uniform Rules of Evidence, 1953, Rule 66; McCormack, Evidence, 1954, § 225, p. 461) would not embrace so much of Warren's testimony that Calarco had stated to him that Riviello had stated fact "X" to Calarco as sought to put in evidence against Riviello his asserted statement of "X" to Calarco as an "admission" of Riviello's. Warren can testify to what the defendant Calarco said to him because the words of Calarco made up a verbal act in furtherance of the conspiracy. If it were of moment to show that *Calarco* thought that Riviello was a party to the burgeoning crime, Warren's testimony that Calarco's words to him also implicated Riviello would be admissible, not to show that Riviello *was* implicated, but to show as against Calarco that *if* Riviello really was involved, *then* Calarco knew it. Uniform Rule 66 illustrates the "multiple hearsay" exception by saying that a hospital record (true "hearsay" and within an exception) would be admissible under the business entry exception to the hearsay rule [(Rule 63(13))], and, if it contained a history of the accident as given by an accident-case plaintiff, that history could be put into evidence against the plaintiff as his "admission" under the Rule 63(7) exception.

The scope of Preliminary Draft of Proposed Rules of Evidence for United States District Courts and Magistrates, 1969, Rule 8–01(c) (3) (v) (comment at p. 169) is uncertain; proposed Rule 8–05 is similar to Uniform Rule 66 and illustrates its sense by use of a hospital record example.

Winship, 1970, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 at the point at which, in a large class of prosecutions, the evidence of the prosecution is frequently most suspect, the informer or accomplice testifying to what a silent co-defendant said the absent defendant had said. If the words had a place in the record because they functioned in executing the crime or forming the criminal plan, they were admissible. But does not basic fairness require that the jury be told at once that the declaration is not evidence that the absent defendant was a participant in the crime and will never become such evidence no matter what other evidence is brought in? The declaration as a verbal act may become, perhaps, the *responsibility* of the absent defendant as a proved participant in the offense, but in an evaluation of the proofs in the legal perspective, it can not contribute to a finding that he was a party to the corrupt program.

If there be truth in the idea of jury incompetency to winnow evidence in pursuance of instructions (contrast United States v. Bless, *supra*, 422 F.2d at pp. 213–214), the consequence would not be the admission of such evidence for all purposes upon the judge's impression that a preponderance of the evidence, if believed, would indicate that the absent defendant was associated in the venture, but the exclusion of the evidence for every purpose on the ground that its prejudicial effect as spurious evidence of participation outweighs its utility as evidence of a constitutive act. Mr. Justice Jackson's vivid portrayal of the pitfalls of conspiracy practice in the courts (Krulewitch v. United States, 1949, 336 U.S. 440, 453–455, 69 S.Ct. 716, 93 L.Ed. 790) surely argues for the due-process importance of precision in jury instructions. See as questioning the view that juries were less capable than judges of making the required analyses, Morgan, *supra*, 43 Harv.L.Rev. at 188, 191.