IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 24, 2004

## STATE OF TENNESSEE v. MARTY WILLIAM THOMAS

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 237927     Douglas A. Meyer, Judge**

---

**No. E2003-00829-CCA-R3-CD - Filed July 16, 2004**

---

The appellant, Marty William Thomas, was convicted by a jury in the Hamilton County Criminal Court of four counts of aggravated rape and one count of aggravated burglary. Following a hearing, the trial court sentenced the appellant to an effective sentence of fifty-four years incarceration in the Tennessee Department of Correction. On appeal, the appellant claims that the trial court erred by (1) admitting into evidence three photographs of the appellant taken on different dates; (2) replaying only the direct testimony of the victim for the jury during deliberation; and (3) denying the appellant's motion for a mistrial on the ground that the jury was prejudiced by media reports. Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and ALAN E. GLENN, JJ., joined.

Mike A. Little, Chattanooga, Tennessee, for the appellant, Marty William Thomas.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; William H. Cox, District Attorney General; and Barry A. Steelman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I. Factual Background

In the early morning hours of February 26, 2000, the victim and her five-year-old son were asleep in her bed when she was awakened "by someone shoving [her] right shoulder." The intruder placed his gloved hands into the victim's mouth and told her not to scream or he would kill her and her son. At that time, the victim's son awoke and began screaming. The intruder ordered the victim to cover her son. The victim complied, and the child stopped screaming. However, the victim continued to scream, resulting in the intruder placing a pillow over her face.

The intruder used an unknown object to rip the victim's nightgown and expose her breasts. He placed his mouth on her breast and forced her to masturbate. The intruder then performed cunnilingus on the victim. When he finished, the intruder forced the victim to stand and he "brushed up against [her]." He told the victim that there were other persons downstairs who "were going to do the same thing to [her]." He then rummaged through one of the victim's dresser drawers until he found a pair of black pantyhose. He ordered the victim to sit on his lap and put on the pantyhose.

When the victim finished putting on the pantyhose, the intruder forced her to perform oral sex on him. He then ordered the victim to her knees. The victim testified at trial that when the intruder ordered her to her knees, she believed she was going to die. The intruder ripped the crotch of the victim's pantyhose with an unknown object and demanded that she "turn over." As the victim "turn[ed] over," she observed two screwdrivers laying on the chest-of-drawers. The intruder penetrated the victim vaginally. However, upon determining that vaginal intercourse was "not right," the intruder told the victim to turn over and he penetrated her anally. According to the victim, "that's whenever he finished."

Once the intruder had "finished," he ordered the victim to stand. The victim pleaded, "Don't kill me. Don't kill me." The intruder told the victim to face the bed and remove the pantyhose. The victim complied. The intruder then ordered her to lie on the bed underneath the covers. The intruder collected the victim's nightgown and pantyhose and left the apartment.

Once the victim was certain that the intruder had left, she went downstairs and called 911. Downstairs, the victim observed an open door which she assumed the intruder had used to enter and exit the apartment. However, when the police arrived, they informed the victim that a screen had been removed from one of the living room windows and the window was broken. Shortly thereafter, the victim was taken to the "Rape Crisis Center" where rape kit testing was performed. The victim testified that she had abrasions around her mouth where the intruder had put his gloved hands.

At trial, the victim testified that she did not know her assailant, nor was she able to make a positive identification when shown photographic lineups of suspects. She related that at the time of the offenses her bedroom was dark with limited light coming through her bedroom door from the hallway. Moreover, the intruder prevented her from looking at him by covering her eyes and threatening her. However, when the intruder initially awakened her, she was able to note certain features, such as a dark moustache, a receding hairline, a pointed nose, blue jeans, and a long jacket. The police used this information to prepare a composite of her assailant. At trial, the victim noted that the appellant bore the features of her assailant.

Chattanooga Police Officer Mark Shelton testified that at approximately 6:14 a.m. on February 26, 2000, he was dispatched to the victim's townhouse at the Morrison Springs Apartments. The victim reported that she had been raped. Upon investigation, Officer Shelton discovered what appeared to be the "point of entry," a living room window. Officer Shelton went outside to investigate. He observed that the screen was missing, the window was "slightly ajar and . . . there was [evidence of] some force to it."

Investigator Timothy Commers of the Chattanooga Police Department's Crime Scene Unit testified that on February 26, 2000, he was called to assist in the investigation of a rape at the Morrison Springs Apartments. As he photographed the exterior of the victim's townhouse, he observed that a window screen was missing from one of the living room windows. He further observed that "the upper section of that window . . . had cracked glass . . . very near the center of the window, and [there were] pry marks on the lower section of the window toward the right side of the frame." Investigator Commers testified that the pry marks appeared to have been made by some type of tool, possibly a screwdriver. Later that morning, officers discovered the missing screen in an overgrown thicket approximately three hundred feet from the victim's townhouse. Investigator Commers took the screen into evidence and processed it for prints.

Investigator Edwin Duke, a latent print examiner with the Chattanooga Police Department, testified that he received a court order to compare photographs of the prints on the window screen with the fingerprints of the appellant. Investigator Duke obtained prints of the appellant's fingers and palms. The print of the appellant's right palm matched that of a palm print found on the window screen. Special Agent Oakley W. McKinney, a forensic scientist with the Tennessee Bureau of Investigation ("TBI"), also compared the appellant's prints with photographs of the prints on the window screen. At trial, Special Agent McKinney testified that latent prints from the window screen matched prints of the appellant's right middle finger and right palm.

Mary Katherine Spada testified that she was employed as a nurse at the Sexual Assault Resource Center, also known as the Rape Crisis Center. On February 26, 2000, she examined the victim in the instant case. Spada noted abrasions on the victim's face, which abrasions the victim claimed had been caused by her assailant placing his gloved hands over her mouth. Because the victim claimed to have been vaginally and anally raped, Spada obtained vaginal and anal swabs. She also obtained an oral swab. Spada placed the swabs and the victim's panties in a rape kit, which she sealed and gave to police.

An audiotape of the prior sworn testimony of Detective Larry Swafford, who was deceased at the time of trial, was played for the jury. Detective Swafford testified that he was present when a sample of the appellant's blood was obtained, which sample was subsequently sent to the TBI crime laboratory. Qadriyyah Pillow Debnam, a serologist and DNA analyst with the TBI crime laboratory, testified at trial that she extracted DNA from the appellant's blood samples and obtained a DNA profile. She compared the appellant's DNA profile with the unknown profile obtained from the victim's rape kit. Debnam "found that [the appellant's] profile was the same as what was inside the kit." Debnam testified that the statistical probability of another individual having the same profile as the appellant was one in eighty-six trillion.

Sergeant Kenneth D. Phillips with the Chattanooga Police Department's Automated Fingerprint Identification Section testified that upon the request of the State, he returned to the crime scene to determine whether the window screen could have been removed from outside the apartment. Sergeant Phillips related that, although the screen was designed to be removed from the inside, he was able to remove it from outside the townhouse by inserting his fingernails under the screen,

lifting the screen, and pulling it out. Sergeant Phillips did not use a screwdriver to remove the screen.

The appellant's grandmother and mother testified on behalf of the appellant at trial. Mary Alice Slaven, the appellant's seventy-three-year-old grandmother, testified that the appellant lived with her at the time of the offenses. Slaven recalled that on the evening of February 25, 2000, the appellant returned home from work, watched television, and fell asleep on the recliner in the living room. The next morning, she and the appellant went to church to have their photographs taken. According to Slaven, the appellant did not leave the house during the night. She explained that she was a light sleeper, and she had slept on the couch in the living room that night. She insisted that she would have awakened if the appellant had started his truck, which was parked near the house.

Diane Johnson, the appellant's mother, testified that at the time of the offenses the appellant was separated from his wife and was living with his grandmother. Johnson stated that she had telephoned Mrs. Slaven's house on the morning of February 26, 2000, to tell the appellant to shave for the photographs. Johnson identified the photographs taken that day and the receipt for the photographs, which she had dated February 26, 2000. She testified that the photograph of the appellant represented the way the appellant appeared on that date. The photograph reflected that the appellant had a moustache and a receding hairline. Johnson admitted that she did not know where the appellant was at 5:30 a.m. on the morning of the offenses.

Based upon the foregoing testimony, the jury convicted the appellant of four counts of aggravated rape and one count of aggravated burglary. Following a hearing, the trial court sentenced the appellant to twenty-five years incarceration for each of the aggravated rape convictions and four years incarceration for the aggravated burglary conviction. The trial court ordered that one of the sentences for aggravated rape and the sentence for aggravated burglary be served consecutively to the remaining sentences, for a total effective sentence of fifty-four years incarceration. The appellant now brings this appeal.

## II. Analysis

### A. Photographs of the Appellant

The appellant first contends that the trial court erred by admitting into evidence three photographs of the appellant taken on different dates. Specifically, the appellant asserts that the two photographs taken eight and fourteen months after the alleged offenses were not relevant. The appellant argues that, even if relevant, the photographs were prejudicial because they were "mug shots," suggesting prior and subsequent criminal activity. The State maintains that the photographs were relevant to establish that the appellant's appearance matched the description provided by the victim. The State further maintains that the photographs did not appear to be mug shots; thus, the probative value of the photographs was not outweighed by the danger of unfair prejudice. We agree with the State.

In the instant case, the victim was unable to positively identify her assailant. However, at trial, she testified regarding certain physical features of her assailant, including a receding hairline and a moustache. In order to demonstrate that the victim's inability to identify the appellant may have been due to the appellant's changing appearance, the State sought to introduce three photographs of the appellant "taken closer in time . . . to the offense." The photographs, which were booking photographs taken September 14, 1999, November 8, 2000, and May 13, 2001, depict the appellant with various styles of hair and facial hair.[1]

The appellant did not object to the introduction of the photograph taken on September 14, 1999, five months prior to the incident. Defense counsel argued that the two remaining photographs were irrelevant, and the State had other evidence of identification in the form of fingerprints and DNA. However, the trial court found that the three photographs were relevant and admissible to demonstrate the appellant's loss of hair. Defense counsel then argued that the probative value of the photographs was outweighed by the prejudicial effect. The trial court disagreed, finding that "none of the pictures look like jail pictures. They just look like pictures." The trial court admitted the photographs, stating that the jury "need[ed] to see the pictures of [the appellant] during the time before and after February [26, 2000.]"

The decision regarding the admissibility of photographs lies within the sound discretion of the trial court, and that ruling will not be overturned on appeal absent a showing of an abuse of that discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). In order to be admitted as evidence, a photograph must be relevant to an issue at trial. Tenn. R. Evid. 402; State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). However, relevant photographs may be excluded if their probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 951.

Upon our review of the photographs in question, we agree that the photographs were relevant to show that the appellant had a receding hairline and, at times, a moustache, features matching the victim's description of her assailant. We further conclude that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice to the appellant. Although the introduction into evidence of mug shots of an accused may lead a jury to infer that the accused has engaged in previous criminal activity, "mug shots alone are not sufficient to cause such inference." State v. Washington, 658 S.W.2d 144, 146 (Tenn. Crim. App. 1983) (citing United States v. Calarco, 424 F.2d 657 (2d Cir. 1970)). Moreover, the photographs in question would not have led the jury to infer prior or subsequent criminal behavior. Other than an unsmiling appellant, nothing in the photographs suggests that they are mug shots. Accordingly, we conclude that the trial court did not abuse its discretion by admitting the photographs into evidence. This issue is without merit.

---

[1]In the photograph taken on September 14, 1999, the appellant had a moustache. In the photograph taken on November 8, 2000, the appellant had a "scruffy" beard and moustache. In the photograph taken on May 13, 2001, the appellant had a moustache and a "goatee."

B. Replaying of the Direct Testimony of the Victim During Jury Deliberation

Next, the appellant contends that the trial court erred by replaying only the direct testimony of the victim for the jury during deliberations. This court has previously concluded that the decision to grant a jury's request to rehear or review evidence rests within the sound discretion of the trial court as limited by Standard 15-4.2 of the ABA Standards for Criminal Justice: Trial by Jury (2d ed. 1980). State v. Jenkins, 845 S.W.2d 787, 793 (Tenn. Crim. App. 1992). Standard 15-4.2 provided:

> (a) If the jury, after retiring for deliberation, requests a review of certain testimony or other evidence, they shall be conducted to the courtroom. Whenever the jury's request is reasonable, the court, after notice to the prosecutor and counsel for the defense, shall have the requested parts of the testimony read to the jury and shall permit the jury to reexamine the requested materials admitted into evidence.
>
> (b) The court need not submit evidence to the jury for review beyond that specifically requested by the jury, but in its discretion the court may also have the jury review other evidence relating to the same factual issue so as not to give undue prominence to the evidence requested.

This court concluded that under Standard 15-4.2, "the trial court would have the discretion to take such action as necessary, including denying the jury's request, to insure that the jury's determination of a factual issue would not be distorted by *undue* emphasis on particular evidence." Jenkins, 845 S.W.2d at 793.

Standard 15-4.2 has since been revised and redesignated as Standard 15-5.2, which provides:

> (a) If the jury, after retiring for deliberation, requests a review of certain testimony the court should notify the prosecutor and counsel for the defense, and allow all parties to be heard on the jury's request. Unless the court decides that a review of requested testimony is inappropriate, the court should have the requested parts of the testimony submitted to the jury in the courtroom. The court may permit testimony to be reread outside the presence of counsel, with the personal waiver of the defendant and the stipulation of the parties.
>
> (b) The court need not submit testimony to the jury for review beyond that specifically requested by the jury, but in its discretion the court may also have the jury review other testimony relating to the same factual issue so as not to give undue prominence to the testimony requested.

ABA Standards for Criminal Justice: Trial by Jury, Standard 15-5.2 (3d ed. 1996).

Revised Standard 15-5.2 refers only to a jury's request to rehear testimony, not review evidence. However, in 1995, Rule 30.1 was added to the Tennessee Rules of Criminal Procedure and provides that "[u]pon retiring to consider its verdict the jury shall take to the jury room all exhibits and writings which have been received in evidence, except depositions, for their examination during deliberations, unless the court, for good cause, determines that an exhibit should not be taken to the jury room." Tenn. R. Crim. P. 30.1. "This rule change[d] the long-standing practice in Tennessee of not allowing the jury in criminal cases to take the exhibits to the jury room for their study and examination during deliberations." Tenn. R. Crim. P. 30.1, Advisory Commission Comments. Rule 30.1 is mandatory unless the trial court, either upon motion or sua sponte, determines that an exhibit should not be submitted to the jury. Id.

Revised Standard 15-5.2 also provides that the parties are to be notified of the jury's request to rehear testimony and afforded the opportunity to be heard on the matter. ABA Standards for Criminal Justice: Trial by Jury, Standard 15-5.2(a) (3d ed. 1996). Moreover, unlike the former standard, revised Standard 15-5.2 provides that the requested testimony may be reread to the jury outside the presence of counsel upon "the personal waiver of the defendant and the stipulation of the parties." Id. Nevertheless, under the revised standard, the trial court retains its authority to take the action necessary to ensure that the jury does not afford the requested testimony any undue emphasis. In view of the revisions to Standard 15-4.2 and the addition of Rule 30.1 of the Tennessee Rules of Criminal Procedure, we conclude that revised Standard 15-5.2 should be the standard to be applied by a trial court responding to a jury's request to rehear trial testimony.

In the instant case, after retiring to deliberate, the jury requested a transcript of the victim's testimony. Because a transcript had not yet been prepared, the trial court agreed, over defense counsel's objection, to allow the jury to listen in open court to a recording of the victim's testimony. The trial court noted that the jury would be permitted to hear cross-examination, as well as the victim's direct testimony. Prior to playing the recording of the victim's testimony, the trial court instructed the jurors that they were not to give any undue weight to the victim's testimony and were to consider it along with the testimony of the other witnesses. The victim's testimony was then played for the jury.

When the recording reached the point in the victim's direct testimony at which the trial court had held a jury-out hearing, the trial court stopped the recording in order to forward to the point where the victim's testimony resumed. However, the jury informed the trial court that they had heard all they needed to hear. When the trial court asked the attorneys to approach the bench, defense counsel stated, "I'm not sure how to respond, Your Honor. First they want to hear it, . . . but now they don't want to hear the cross examination. I think I need just a moment to think about it." While defense counsel considered the issue, the trial court allowed the jury to resume their deliberations.

On appeal, the appellant contends that by allowing the jury to listen to only the victim's direct testimony and not cross-examination, the trial court gave the direct testimony of the victim undue prominence. The State submits that the appellant waived this issue by failing to request that the jury be required to listen to the victim's testimony in its entirety. However, the State also maintains that the trial court properly played the portion of the victim's testimony requested by the jury. Because we are unable to determine whether the appellant properly objected to the playing of only a portion of the victim's testimony, we will address the issue on the merits.

We conclude that the trial court did not abuse its discretion by allowing the jury to rehear only a portion of the victim's testimony. When the trial court stopped the recording at the jury-out hearing, the jurors advised the trial court that they had heard the testimony necessary to resume their deliberations. Standard 15-5.2(b) provides that the trial court "need not submit testimony to the jury for review beyond that specifically requested by the jury . . . ." ABA Standards for Criminal Justice: Trial by Jury, Standard 15-5.2(b) (3d ed. 1996). Moreover, this court has previously concluded that a jury may rehear portions of a witness's testimony. See State v. Frank Gaitor, No. E2001-02531-CCA-R3-CD, 2002 WL 31863299, at *12 (Tenn. Crim. App. at Knoxville, Dec. 23, 2002), perm. to appeal denied (Tenn. May 27, 2003); State v. Steven Radley, No. 01C01-9311-CC-00382, 1994 WL 377212, at *3 (Tenn. Crim. App. at Nashville, July 14, 1994). In any event, the appellant has failed to demonstrate that the jury afforded the victim's direct testimony undue prominence or that he was prejudiced by the failure of the jury to hear the victim's testimony in its entirety. This issue is without merit.

### C. Motion for a Mistrial

Finally, the appellant challenges the trial court's denial of his motion for a mistrial. Specifically, the appellant contends that local media reports portrayed the appellant as a serial rapist. The appellant argues that this extraneous prejudicial information was imparted to one or more of the jurors, thereby necessitating a mistrial. The State maintains that the trial court properly denied the appellant's motion.

A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy when a trial court cannot continue without causing a miscarriage of justice. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial lies within the sound discretion of the trial court and that decision will not be overturned on appeal absent a clear abuse of that discretion. State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998) (citing State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990)). The burden of establishing the necessity for a mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

In the instant case, the jury was not sequestered. The record reflects that on the afternoon of November 14, 2002, the trial court charged the jury and then adjourned court, permitting the jury to begin their deliberations the following morning. Prior to adjournment, the trial court instructed the

jury to refrain from discussing the case, watching the news, or reading the newspapers. That evening, a local news broadcast noted the appellant's prior convictions, allegedly portraying the appellant as a serial rapist. The next morning, defense counsel advised the trial court of the news broadcast and asked the trial court to voir dire the jurors individually. The trial court agreed to individually question all thirteen jurors.

While none of the jurors had watched the local television news the previous evening, several of the jurors had overheard other jurors mention hearing about the trial on the radio that morning. Jurors McDermott, Whitmire, G. Blaylock, and Frost stated that Juror McKenzie had announced that he heard a report about the appellant's trial on the radio. Jurors Frost and Bates said that Juror P. Blaylock claimed that she had also heard a report about the appellant's trial on the radio that morning. The jurors related that neither Juror P. Blaylock nor Juror McKenzie discussed what they had heard regarding the appellant or his trial.

Three jurors conceded that they had heard reports about the appellant's trial on the radio that morning. Juror Pascua stated that he was listening to the radio at home when it was announced that the jury deliberations were beginning. He said that he did not hear any facts about the case and walked away when he realized it was news of the appellant's trial. Juror P. Blaylock stated that the news was on when she turned on her car radio, so she turned the radio off. She related, however, that Juror McKenzie had announced that he heard a radio report about the appellant's trial. Upon questioning by the trial court, Juror McKenzie confirmed that he told the other jurors that he had heard a radio report about the appellant and his trial. However, he claimed that he did not discuss "the specifics" with the other jurors. When asked what he heard on the radio, he stated, "I guess I heard probably enough to, you know, to – it probably wouldn't change my decision, but I did hear enough probably that I didn't know already." Juror McKenzie stated that he learned that the appellant had previously been accused of rape.

At the conclusion of the voir dire, defense counsel moved for a mistrial. The trial court agreed to excuse Juror McKenzie, but denied the motion for a mistrial, finding that the remaining jurors had not been "poisoned." To ensure that the jurors remaining on the panel had not been prejudiced, the trial court questioned them as a group prior to their deliberation. All twelve jurors responded that Juror McKenzie had not discussed what he heard on the radio. The jury then retired to begin their deliberations.

When extraneous prejudicial information or any outside influence is brought to bear on a juror, the validity of the verdict is questionable. State v. Parchman, 973 S.W.2d 607, 612 (Tenn. Crim. App. 1997). Rule 606(b) of the Tennessee Rules of Evidence provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's

mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

"Extraneous information" is information from a source outside the jury. Tony Carruthers v. State, No. W2002-02852-CCA-R7-PD, 2003 WL 22272425, at *5 (Tenn. Crim. App. at Jackson, May 6, 2003) (citing Caldararo v. Vanderbilt University, 794 S.W.2d 738, 742 (Tenn. Ct. App. 1990)). External influences which could warrant a new trial if found to be prejudicial include: (1) exposure to news items about the trial; (2) consideration of facts not admitted in evidence; and (3) communications with non-jurors about the case. Id.

In the instant case, the appellant asserts that "[i]t is clear from the questioning of the jurors that extraneous prejudicial information was imported to one or more jurors regarding the criminal history of the [appellant]." We disagree. Jurors P. Blaylock and Pascua conceded that they heard news reports on the radio about the appellant's trial, but claimed that they either walked away or turned off the radio, hearing only that jury deliberations were beginning that morning. Juror McKenzie conceded that he heard on the radio that the appellant had previously been accused of rape. He also admitted telling the other jurors that he heard reports on the radio about the appellant and the trial. However, he denied telling the other jurors "the specifics" of what he heard. The jurors confirmed this. Nevertheless, the trial court excused Juror McKenzie from serving on the jury in the instant case. We conclude that the appellant has failed to show that the remaining jurors were prejudiced as a result of information disclosed by Juror McKenzie. Accordingly, the trial court properly denied the appellant's motion for a mistrial.

### III. Conclusion

Finding no reversible error, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-10-