**UNITED STATES of America,**
**Appellee,**

v.

**Irving PROJANSKY et al., Defendants-**
**Appellants.**

Nos. 691–694, Dockets 71–2006, 71–2081,
71–2082 and 71–2124.

United States Court of Appeals,
Second Circuit.

Argued May 17, 1972.

Decided June 22, 1972.

Certiorari Denied Nov. 13, 1972.
See 93 S.Ct. 432, 433, 443, 444.

See also, D.C., 44 F.R.D. 550.

**124**

George B. Collins, Chicago, Ill. (Collins & Amos, Chicago, Ill.,) for defendant-appellant Harry Brainin.

Patrick A. Tuite, Chicago, Ill., for defendant-appellant Irving Projansky.

Morton J. Schlossberg, New York City (Joseph J. Marcheso, Philip M. Kazin, New York City, of counsel), for defendant-appellant Gerald Leavitt.

Stanley M. Meyer, Brooklyn, N. Y. (Preminger & Meyer, Brooklyn, N. Y.), for defendant-appellant Michael Geier.

John J. Tigue, Jr., Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty. S. D. N. Y., Jeffrey Harris, Carter LaPrade, Peter F. Rient, Asst. U. S. Attys., of counsel), for appellee.

Before MOORE, SMITH and HAYS, Circuit Judges.

MOORE, Circuit Judge.

Irving Projansky, Harry Brainin, Gerald Leavitt, and Michael Geier appeal from judgments of conviction entered against them in the United States District Court for the Southern District of New York on September 17th and 23rd, 1971, after a three and one-half month trial before Judge Lasker and a jury. The four appellants, with twelve others, were indicted on August 23rd, 1967, for their alleged participation in a concerted effort to raise by manipulation the price of the stock of Hercules Galion Corporation (Hercules), a company listed on the American Stock Exchange (AMEX).[1] We affirm all four judgments of conviction.

1. The indictment was brought in fourteen counts. Count one charged the sixteen defendants and six conspirators not named as defendants with conspiracy to commit offenses against the United States (18 U.S.C. § 371 (1970)); the substantive offenses were alleged to be violations of sections 17(a) and 24 of the Securities Act of 1933, 15 U.S.C. §§ 77q(a), 77x (1970), sections 9(a) (2) and 32(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78i(a) (2), 78ff(a) (1970), and 18 U.S.C. §§ 1341, 1343 (1970) (mail fraud).

The sixteen defendants charged were the four appellants, Arthur Keller, Stuart Projansky (Irving's son), Fred Weitz, Mark Rolland, Spero Furla, Murray Peltz, Burton Buddy Kozak, Harris Nagorsky, Herbert Werman, Edward Wetzel, Zafe Zafer, and David Zisfein. Named as co-conspirators but not as defendants were Morris and Eva Childs, George Georges, Irving Taub, the First National Bank of Lincolnwood, and Argus Capital Corporation.

Count two charged Projansky, Brainin, Leavitt, and others with violations of

## I.

### A. *Events Prior to Spring of 1965*

In September of 1963 Projansky, Brainin, and Irving Taub, the sole officers and directors of Argus Capital Corporation (Argus), an investment and finance company located outside Chicago, embarked on a program to gain control of Hercules, a manufacturer of heavy trucks. Pursuant to this program, during 1963 and 1964, approximately 275,000 of the 927,000 shares of Hercules stock then outstanding were purchased by Projansky, Brainin, Taub, and their associates. These shares, representing working control of Hercules, were deposited at Argus. Thereafter Brainin, as sole voting trustee of the shares, exercised the control they represented to elect himself, Projansky, Taub, and Charles Meyers to Hercules' nine-man board of directors and to install Meyers as president of Hercules.

Despite the general upward trend of the stock market from 1963 to 1965, the price of Hercules fluctuated moderately on low volume until the promotion here under focus took hold. This relatively poor performance of Hercules disgruntled the shareholders. They believed that Hercules was a sound investment. Moreover, the firm was developing a garbage truck expected to become dominant in the garbage truck market and building a new plant expected to increase productivity. Finally, Brainin and Projansky were interested in mergers and acquisitions, and if the price of Hercules stock were higher then the firm's bargaining power in any such negotiations would be enhanced.

### B. *June-July 1965: A Plan*

During the spring of 1965 Projansky discussed the prospects of Hercules with Arthur Keller, president of the First National Bank of Lincolnwood, Illinois (FNBL). Projansky was chairman of the board of the FNBL. Keller, in turn, discussed Hercules with Gerald Leavitt, an acquaintance and a customer of the bank. A graduate of the University of Illinois with a Bachelor of Science Degree in Economics, Leavitt had recently left a firm in the ladies' garment wholesaling business with which he had been for sixteen years and was studying to become an investment advisor.

Thereafter in June of 1965 Leavitt brought his brother-in-law, Mark Rolland, to the FNBL for a meeting with Keller and Projansky. Rolland was a 50% partner in Investment Associates, a Chicago stock factoring firm (a firm that lent money for the purchase of stock, the loans collateralized by the stock bought). Projansky expressed his and the shareholders' interest in seeing the price of Hercules stock increase. Leavitt and Rolland responded by assuring Projansky and Keller that they could be of considerable assistance.

sections 9(a) (2) and 32(a) of the 1934 Act and 18 U.S.C. § 2 (1970) for the period of August 23, 1965 to September 15, 1965. Count three charged Projansky and others with the same violations for the period of November 30, 1965 to December 9, 1965. Count four charged Projansky, Geier, and others with the same violations for the period of February 4, 1966 to February 16, 1966. Counts five through fourteen charged Projansky, Geier, and others with violations of sections 17(a) and 24 of the 1933 Act and 18 U.S.C. § 2 for the period of July, 1965 to the date of the indictment.

Eight of the defendants entered pleas of guilty to one or more counts of the indictment prior to trial. Several of them testified for the government at trial.

Counts 7, 11, and 14 were dismissed as to all defendants at the close of the government's case. On June 5, 1971, the jury found Irving Projansky, Brainin, and Leavitt guilty on counts one and two, Geier guilty on counts 1, 4–6, 8–10, and 12–13, Zafer guilty on counts one and three, and Peltz and Stuart Projansky not guilty on all counts. A mistrial was declared on June 7, 1971, as to Weitz when the jury was unable to reach a verdict on the counts against him. Judge Lasker sentenced Projansky to one year in jail, Brainin to 3 months in jail and a fine of $20,000, Geier to 6 months in jail, Zafer to 4 months in jail, and Leavitt to a $20,000 fine. Zafer filed a notice of appeal but withdrew it on February 16, 1972.

[Keller]

A. Well, yes, Mr. Leavitt stated that he had been taking an examination to become a security analyst, or some kind of security dealer, and that he anticipated giving up his present occupation, whatever that was, and going into the security business, and that he could be very helpful in getting people to take an active interest in the purchase of Hercules Galion stock.

Further, Mr. Rolland stated that he had a particular friend who single-handedly doubled the price of a particular stock. I don't think he mentioned the name at that time. And that he, with his friends, could do an excellent job in creating sponsorship and developing the activity and raising the price of Hercules Galion stock.

. . . . . .

[Rolland]

A. I told Mr. Projansky that I had had experience along those lines, and that I had been involved with a stock or company called Pentron Electronics where I had raised the price of this stock considerably, doubled the price of this stock, and I thought I could be helpful to him if they should decide anything along those lines.[2]

Shortly thereafter the parties met again at the FNBL. Rolland and Leavitt brought with them Spero Furla, a registered representative and a close friend of Rolland's. Furla was the companion of Rolland that had assisted in raising the price of Pentron.[3] At this second meeting Projansky again explained the reasons for his desire to see the price of Hercules increase, and stated that he would like to see it rise from its then level of around 6 to 12 or 13. Speaking for Leavitt and Furla, Rolland foresaw no difficulty in meeting this objective. In consideration for their services, the "Rolland group" asked for options to buy Hercules stock at bargain prices. They preferred this form of payment over cash because they wanted their expected income to be taxed at capital gains rather than ordinary income rates. The meeting concluded with Projansky's admonition that any deal depended on the approval of his fellow directors Brainin and Taub.

[Furla]

The Witness: Mr. Projansky said that he wanted the price of the stock higher for the reason that it was only selling at book value at that time, which was around $6, they wanted to acquire other companies and make acquisitions and it wasn't very practical or feasible at the price that the stock was selling at at that particular time, and he wanted to know if we were able—capable of sponsoring the stock and making it go higher.

Mr. Rolland and I said that we were able to do this, . . .

. . . . . .

[Keller]

A. Well, after Mr. Rolland introduced Mr. Furla, Mr. Furla stated that Mr. Rolland had told him about the desire for sponsorship in Hercules Galion stock and that he had been

2. Transcript of Trial (Transcript) at 4357–58 (Keller), 403 (Rolland).

None of the appellants testified at trial, and no testimony was offered by them to contradict or refute the version of events as recounted by the witnesses whose testimony is quoted in text. While the appellants did attempt to impeach the credibility of the witnesses, the jury could and obviously did find them to be credible. Their testimony can thus be quoted to illustrate the contentions that the government established at trial. *See* Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct.

457, 86 L.Ed. 680 (1942); United States v. D'Avanzo, 443 F.2d 1224, 1225 (2d Cir.) (per curiam), cert. denied, 404 U.S. 850, 92 S.Ct. 86, 30 L.Ed.2d 89 (1971).

Rolland not only pleaded guilty to the charges brought in this case, but also pleaded guilty to an indictment, 67 Crim. 509, charging manipulation of the price of Pentron stock.

3. Who also pleaded guilty to the charges brought in the Pentron indictment.

studying or making some charts of the stock and that he felt it would be a very simple task to develop sponsorship and get activity in Hercules Galion stock.

He also then told us that he, with a few associates, had doubled the price of a stock which I don't believe he mentioned at that time—he may have, I don't remember—from one-half to three, and from the description that he had of Hercules Galion stock, that that was a much more difficult task.

.　.　.　.　.　.

[Rolland]

Mr. Furla then got into a general discussion as to the Pentron Electronics, and that we had a team of brokers throughout the United States that could help raise the price of the stock.[4]

### C. *August-September 1965: The Deal Is Finalized*

The agreement between Projansky's group and Rolland's group was finalized in a series of three meetings in August and early September of 1965. On the one hand were Projansky, Brainin, Keller, and Taub, representing the Hercules interests, and on the other were Rolland, Furla, and Leavitt, representing the promoters. During the first meeting Brainin repeated what Projansky had said in the earlier meetings about the soundness of Hercules and the desire to see its stock price increase to enhance Hercules' merger position. Brainin stated that there were approximately one million shares outstanding, but that 30 to 35% of these shares were held dormant at Argus and voted as a block by him. After Rolland and Furla repeated their experience in stock promotion, they eventually proposed these specific terms of agreement: the right to buy 36,000 shares of Hercules stock for themselves and the brokers who would be working with them; financing for the purchase of these shares to be provided by loans from Argus (secured by the shares purchased, the borrower incurring no personal liability);[5] five thousand dollars in expense money; the right to inspect Hercules' stock transfer records; and assurance that insiders would not sell while the promoters were leading Hercules up in price.

[Keller]

.　.　.　he [Brainin] stated that he is exploring, or he has explored, the area of mergers and acquisitions and it would be very advantageous to him and all of us, and the group of investors, and the Hercules Galion Corporation, if the stock were selling at like 12 instead of in the area of 6 and a fraction, and it would be very advantageous to have mergers at that figure, and if these gentlemen who are presumably knowledgeable in the area of advancing the prices of stock could advance it to a price of 12, and hold it there for six months, it would be a service in which he might be interested.

.　.　.　.　.　.

[Rolland]

A. Mr. Brainin stated, "If we do make a loan to you, how are we to know whether you are going to really promote the stock? How are we to know if you are merely going to take this stock and then run the stock up and sell it and leave us without performing the job that we are paying you for?"

I indicated to him that I was only interested in a long-term capital gain, and that that means I'd have to be involved in the stock for a six-month

---

4. Transcript at 5733 (Furla), 4358-59 (Keller), 406 (Rolland).

5. Mr. Brainin stated that he would like us to put up some equity towards the loan. I told him that that was completely out of the question, that I had no intention of putting up any money in a situation where I *was being paid to* promote the stock, and we got close to an argument. *Id.* at 423 (Rolland).

period of time and that should make him feel at ease.

. . . . . .

[Keller]

Then Mr. Rolland said, "As long as we are not getting any stock or anything right now, and we are ready to start this deal off, we will need $5,000 in cash to distribute to our co-brokers to show them good will and get them to work with us."

. . . . . .

Q. Did you [Rolland] have a conversation with Mr. Furla and Mr. Leavitt at this time about how much stock you wanted?

A. Yes.

Q. Was there any agreement reached among the three as to how much stock you were going to ask for?

A. We agreed that we would ask for 50,000 shares [initially] of stock to be purchased somewhere either below the market or very close to the market. It was also agreed upon that I would do most of the negotiations, and that whatever I agreed upon, that would be what the arrangements would be.[6]

At the second meeting, attended by the same parties, the Projansky group agreed to the terms proposed by the Rolland group. The option price of the 36,000 shares was set at $7.25, but the parties agreed to execute the loan only after the price of Hercules rose above $7.25. Timing the loan in this way would not subject Brainin to criticism for making a loan equal to 100% of the value of the collateral. Rolland did demand, however, immediate payment of the $5000 in order to induce other brokers to enter the promotion. Finally, the parties agreed that Keller would coordinate the initial purchases of 10,000 shares of Hercules by himself and others and would place the orders through Furla.

[Keller]

Then Mr. Rolland said it would be advisable if—no, he then said "We ought to have a kickoff order of a substantial number of shares to really start this thing off," and again Mr. Projansky and I had a discussion about the kickoff, and I said I would kick it off if Dr. Weitz and Morris Childs would join in kicking it off with me, and he said they would, they would.

. . . . . .

Then Mr. Rolland said, "I believe and I feel that all orders should be funneled through Mr. Furla, that he is with Blair & Co."—I believe it was—"and that he will execute some of the orders and pass on or ferret out orders to his co-brokers, whoever they may be," but to leave it to him to arrange the total purchase of which he would execute only a portion thereof.[7]

In preparation for the kickoff, Projansky and Keller informed Fred Weitz, a director of the FNBL, and Eva and Morris Childs, Projansky's sister and brother-in-law, of the plan to promote the stock of Hercules. In order to give some real punch to the kickoff, Weitz took out unsecured loans of $95,000 from the FNBL and gave the proceeds to Keller to purchase Hercules stock; the Childs borrowed $150,000 from the FNBL, half of which was unsecured, for the same purpose. On the loan committee that approved the loans were Projansky, chairman, and Keller, Weitz, and Taub.

Further fuel for the kickoff was provided during the third Argus meeting in early September of 1965. Rolland, Furla, and Leavitt signed notes backdated to August 26, 1965, for $261,000 in loans from Argus. The proceeds took the form of four checks, which the three promoters promptly endorsed over to the sellers of the 36,000 shares of stock purchased under the option term of the agreement. The sellers were Gary

6. *Id.* at 4363 (Keller), 413–14 (Rolland), 4370 (Keller), 412–13 (Rolland).

7. *Id.* at 4371 (Keller).

Brainin, Brainin's son, and Albert Green, Brainin's long-time business associate. On September 13, 1965, the FNBL executed a $100,000 unsecured loan to Argus to help cover the loan made by Argus to the Rolland group.

Keller delivered the expense money of $5,000 to Rolland on September 9, 1965. The $5,000 was in the form of two checks, one for $2,000 from Weitz, the other for $3,000 from the Childs. On the reverse of the Weitz check was written "Fee for Arranging Financial Advice." On the reverse of the Childs check was written "Fee for Consultation." Rolland in turn issued two checks to Leavitt and Furla, each in the amount of $1,666. Leavitt in response "billed" Rolland for services rendered.

### D. *The Promotion in Operation*

Beginning in August and continuing into early October, 1965, Keller purchased approximately 20,000 shares for himself, Weitz, and the Childs, paying for the shares with the proceeds of unsecured loans obtained at the FNBL. The bulk of the orders were placed through Furla, who executed some himself and gave the rest to other brokers.

Two other prominent participants during this period were Harris Nagorsky and Zafe Zafer, Chicago brokers recruited by Rolland and Furla. Both brokers were promised an option to purchase 4,000 shares of Hercules at $8.00 per share for every 25,000 shares they purchased for their customers and held for six months, as well as easy loans at the FNBL. During the last months of 1965, Nagorsky and Zafer purchased 29,-000 and 19,500 shares of Hercules, respectively, for their customers. These purchases, together with 26,000 shares purchased by Furla for his customers and the purchases of other co-conspirators, represented 43% of all the Hercules shares traded on the AMEX during this period. The buying program conducted by the brokers was carefully planned and executed to produce the illusion of real and sustained interest in Hercules stock.

A. At the beginning, Mr. Zafer and Mr. Nagorsky and I [Furla] and Mr. Rolland would get together and discuss who would in the morning open the stock and who would place orders in the afternoon and who would place orders towards the close of the market.

And we also had phone conversations during the day timing certain orders.

.　　.　　.　　.　　.　　.

The Witness: Well, Saturday mornings it was referred to as brokers' day because quite a few brokers would come to the bank, including Mr. Zafer, Mr. Nagorsky, myself [Furla], once in a while Mr. Bernstein, and others that I didn't know, and we would assemble towards the back end of the bank close to where Mr. Keller's desk is and then we would eventually get into the board room where there is a big desk in there and we would have short meetings or discuss our problems there.

.　　.　　.　　.　　.　　.

Q. Do you [Nagorsky] recall what you and Mr. Zafer would discuss during these telephone conversations?

A. Well, we would talk about Hercules Galion. We would discuss the opening of the market, the closing of the market, who would do the opening let's say, the opening for the following day or who would handle the closing for that particular day. We would discuss the market in sizes, how much stock was being offered, at what time of the day. I might call him to use his house to get a market or size, because maybe I was using mine too much. He would call me possibly to do the same, because he didn't want to use his wire any more that time also. We would discuss the sellers in the stock, where the selling was coming from. We would discuss the painting of the tape, in other words, how to break up orders, and if we got a large order how to handle it, whether to put it in a block or whether to put it in pieces, whether to space it out

timewise. Mr. Zafer and I would time our orders so as to try to get them in together, let's say, to take a block of stock that was being offered out of the market. We would have conversations concerning the closing, whether to put it in as a market order or whether to put it in as a fixed price order.[8]

Leavitt also participated in the efforts to enlist brokers who would buy Hercules stock for their customers. In late September of 1965 he assured Rolland and Furla that he was working diligently toward this end and claimed to have been successful in interesting brokers other than those recruited by Rolland and Furla. During September he recommended and purchased 11,300 shares of Hercules for himself and customers of the brokerage firm at which he worked. These purchases constituted almost 10% of all Hercules shares traded on the AMEX during September. During this period Leavitt also tried to interest his superior at the brokerage firm where he worked in Hercules, but the superior instructed Leavitt to cease recommending Hercules to customers and to have nothing further to do with the promotion.[9]

In October of 1965 Rolland and Furla brought George Georges, a speculator in stocks and real estate, into the promotion. After being introduced to Projansky, Georges was given an $80,000 loan at the FNBL, $54,000 of which was unsecured. Georges claimed an ability to tap New York buying power, and in late November and early December, enlisted three New York brokers.

The efforts of the promoters of Hercules were successful. From a level of 6¼ at the end of July (on volume of 15,800 shares), Hercules jumped to 8⅝ at the end of August (on volume of 38,900 shares), and to 10½ at the end of September (on volume of 123,400

shares). However, at the end of October the price had fallen back to 9¾ (on volume of 32,800 shares), and by the end of November to 9¼ (on volume of 28,000 shares).

### E. *In the Manner of Sisyphus*

A predictable futility increasingly characterized the promoters' efforts. While some diligently worked to increase the price of Hercules, others undercut their efforts by selling as the rewards for doing so increased. The promoters themselves were not beyond such treachery when the occasion presented itself.

That they were being betrayed was a continual source of exasperation to the promoters. From the very beginning Rolland had feared that insiders at Argus or Hercules would thwart the success of any promotion effort and had sought to insure against the occurrence of such sales by insisting on the right to inspect Hercules' stock transfer list and by obtaining vows from the insiders that they would not undercut the promotion.

Yet, as the October and November figures of Hercules' price indicate, all was not right with the promotion. Someone was selling while the brokers were busy buying. Their concern over this development was so great that they followed Keller into the hospital with their complaints. Keller, on October 3, 1965, had suffered a serious heart attack.

[Keller]

A. . . . Mr. Rolland told me that Hercules Galion is slipping because Projansky and Brainin's group are selling stock, and they can't keep supporting the market if the inventors are selling stock into them.

I said, "What do you expect me to do here, just let me alone and go and tell Mr. Projansky and tell Dr. Weitz but don't tell me, there is nothing I

---

8. *Id.* at 5769–70, 5773–74 (Furla), 1771–72 (Nagorsky).

9. In September Leavitt, under pressure to discharge debts remaining from his association with the ladies' garment firm, sold the 12,000 Hercules shares he had under option. His profit on the sale was $29,000.

can do about it," and that was the end of that.

They came a second time a few days thereafter, and gave me the same conversation, and I told them that "You will have to go and see Irving Projansky or Dr. Weitz, there is nothing I can do or want to do, and please don't come back any more."

．　　．　　．　　．　　．　　．

[Keller]

The Witness: On this occasion, they [Rolland and Furla] stated that you fellows are selling directly—Irving Projansky and Dr. Weitz—"You fellows are selling stock into us and we can't keep the price." Irving Projansky told them, "We are not selling stock into you and you fellows aren't doing your job."

Then I interjected, "Carry this on elsewhere and let me alone." [10]

However, a few of the sellers were rooted out. Late in 1965 Rolland and Furla discovered from their inspection of Hercules' stock transfer list, that the chairman of the board of Hercules, Mr. Van Alstyne, was selling Hercules stock. They complained to Brainin, who phoned Van Alstyne (who was unaware of the promotion) and informed him that his sales were counter-productive. On another occasion, Rolland and Furla discovered that Arthur Dickholtz, a director of the FNBL, was selling substantial quantities of Hercules stock held at Argus. Rolland personally spoke to Dickholtz about his selling; as a result, Rolland obtained an option on 6,500 shares of Dickholtz' stock at $8.00 per share.

In December there were a series of meetings between Projansky, Keller, and the active brokers (excluding Leavitt). All sides grew increasingly suspicious of the motives and abilities of their comrades.

A. George [Georges] stated that I [Rolland] had not been truthful with all the brokers that are involved in the promotion. He said that the most deceitful had been Spero Furla because he had not disclosed that he had an option on a block of stock. He said that we should, both Spero and myself, should take all of the stock, put it together and give it to him and that he will divide it up amongst the Chicago brokers and also a New York team that was assembling to make the stock go up.

Mr. Zafer complained that he had purchased a great number of shares of stock and he was not being paid enough.

Mr. Nagorsky complained that he also was purchasing a great number of shares of stock.

Georges stated that 50 or 60,000 shares of stock had been placed, purchases, through the Lincolnwood Bank with various brokers.

Nagorsky complained bitterly that he had not received any of that business and he should have.

The meeting broke up with the intention of having another meeting later that day at Arthur Keller's office.

10. Transcript at 4410, 4413 (Keller). That the team spirit was less intense than it should have been was also evident during the meetings the brokers frequently had among themselves.
A. There were periods of time when I [Furla] would bring down confirmations and Mr. Zafer would bring down confirmations and Mr. Nagorsky would bring down confirmations, trying to prove up what each did that particular day, to prove that we bought stock that day. And I remember late in October when it was added up how many each of us had purchased, it was really more than the total trading that particular day . . . ..

．　　．　　．　　．　　．

A. At this particular meeting Mr. Zafer and I [Nagorsky] had gotten into an argument because of the fact that we both had claimed to purchase more shares of stock than traded that day, and we got into kind of a heated thing, and Spero Furla got into it because he also claimed to buy some shares that day . . . ..
*Id.* at 5772 (Furla), 1782 (Nagorsky).

[Keller]

. . . Mr. George Georges started off saying that Mr. Rolland was not compensating these stock brokers, that he had misrepresented the number of shares available for distribution, and that nobody really wants to work any more with Rolland and Furla, they all want to work with me, George Georges, and I want authority here to run this thing and I am going to run this thing, and the brokers will only work with me.

Then Mr. Zafer said, "I sold X number of shares"—I don't recollect the number—"and I haven't been paid anything, and I want my money."

And Mr. Nagorsky said he had sold X number of shares and he hadn't been compensated.[11]

F. *Kozak and the New York Influence*

About this time, in December of 1965, Burton Kozak, another Chicago broker, joined the promotion at the invitation of Nagorsky and Georges. While Georges had been vying for the leadership of the promotion with Rolland and Furla, at a meeting at the Covenant Club in Chicago in mid-January of 1966, Kozak, with promises of New York contacts, displaced Georges and became one of the leaders of the promotion with Rolland and Furla.

Q. Can you [Kozak] tell us what happened at the Covenant Club meeting, . . . ?

A. . . .

Zafe Zafer was having a big argument with Mark Rolland and Spero Furla. He first was complaining about how they had taken him in in Pentron Electronics in 1964 and never paid him. Then he started screaming something in Greek to Mr. Furla that I didn't understand.

The Court: How do you know it was Greek? It was Greek to you, anyway?

The Witness: It was Greek to me. They always talked Greek.

A. Mr. Zafer was trying to get George to remain in the picture and to get Mr. Rolland and Mr. Furla out of the picture.

He came there as the spokesman for George Georges. There was a bitter argument between Mr. Zafer, Mr. Furla and Mr. Rolland.

Mr. Keller said he was going to have to live without George Georges and that everything will go on as usual, starting the following day, . . .[12]

Kozak's principal contact in New York was the broker Michael Geier. On February 5, 1966, Kozak, Rolland, and Furla met with Geier at the International Hotel at JFK Airport in New York.

[Rolland]

A. Buddy Kozak said to Mr. Geier that he had a nice little stock that he wanted to promote. He said the people behind it control the Hercules Galion Company and also the First National Bank of Lincolnwood. He mentioned Mr. Projansky, Mr. Brainin, Mr. Taub.

. . . . . .

He asked Mr. Geier if he had ever heard of them. Mr. Geier was not familiar with them.

He asked, he stated, "What do you think?"

. . . . . .

A. Mr. Kozak stated to Mr. Geier, "What do you think you could do with the situation where there is a total of a million shares outstanding and a free float of stock of about a quarter of a million shares?"

Mr. Geier stated an issue that small he could garble [sic] up himself, there would be no problem at all putting the stock up to $16 a share.

Buddy Kozak said, "If you are able to do that I can offer you an option on about 15,000 shares of stock at $8 a share. When the stock reaches 16

11. *Id.* at 600 (Rolland), 4464 (Keller).

12. *Id.* at 3018–19 (Kozak).

we will sell it and pay you the balance in cash, the difference between the 8 and the 16.

Geier said, "I am not interested in stock or options, I am only interested in cash."

Bud Kozak says, "That being the case we can arrange so that it is all in cash. However, you will still have to make a cross of the stock at $15 a share."

Mike Geier says, "One other thing. When the stock gets up to about 13 I would want advance payment of about $25,000."

Bud Kozak says, "I think I can arrange it." [13]

The following Monday Geier phoned Kozak and told him that his partner had agreed to the arrangements and that they were immediately proceeding in execution of their agreement. Geier quickly rounded up a team of New York brokers. Their implementation of the promotion was as methodical as that of their Chicago brethren. So successful was Geier that by Wednesday, February 8th, Hercules hit 13 (on volume of 20,900 shares). He telephoned Kozak to inform him that he was coming to Chicago to pick up his $25,000. But, unfortunately, while Geier was in the air on his way Hercules closed below 13. Kozak and Keller, however, agreed to pay Geier $12,500 as a show of their faith in him. When confronted with the news of Hercules' close, Geier became furious; he phoned his partner in New York and both bitterly complained to Kozak and Rolland about the selling that had obviously taken place. Neverthe-

less, Geier affirmed that the deal was still on, and returned to New York to redouble his efforts.

On February 10, 1966, Hercules opened on a block of 10,000 shares at 13¾; it closed at 14⅝, an all-time high. During a phone conversation Kozak told Geier that he would shortly fly to New York with the balance of the $25,000. After obtaining the money from Stuart Projansky at the FNBL, Kozak flew to New York and met Geier and Peltz at the airport. Kozak handed the money to Peltz, who said, "Give it to the kid." [14] The kid (Geier) then left for the race track.

### G. *The Fourth and Final Quarter*

Geier worked arduously through the first half of March on the Hercules promotion. During this period, for example, from January 28th to March 31st, Geier spoke to Kozak some 655 times coordinating the promotion. But by this time the effort to shore up Hercules became increasingly futile. The treacherous selling mounted. Keller, who was forced to return to the hospital in mid-February because of a gall bladder infection, once again became an involuntary audience for complaining participants.

[Keller]

A. Mr. Kozak and Mr. Rolland, particularly, were complaining again that the investment group was selling into them, that they are absorbing a lot of stock from the investment group, and the investment group has to stop selling into them. So I said that there is nothing that really I can do, "why don't you talk to Dr. Weitz

---

13. *Id.* at 609–11 (Rolland). In preparation for the meeting with Geier the Rolland group had Hercules "dressed up."

Q. Did you [Kozak] have any discussion with Mr. Keller about the price of the stock during this conversation?

. . . . .

A. I told Mr. Keller that the stock was about $11, on Thursday it was about 10½ to $11, and I said that before going to New York I think it would be advisable to dress up the stock a little and move it up, so I could at least

go into New York with the stock around $12.

Mr. Keller assured me that if I needed any buying power on the Friday, the day before I went to New York, he would supply it for me.

[It was supplied; Hercules closed on Friday at 11⅞, up a point and a quarter.]

*Id.* at 3035–36 (Kozak).

14. *Id.* at 3075 (Kozak).

about it, Dr. Weitz is here, and he is available to talk to, you can talk to Mr. Projansky, I don't see any reason for coming here talking to me. From now on talk to Dr. Weitz or Mr. Projansky about whatever your problems are."

. . . . . .

A. . . . Dr. Weitz, Irving Projansky, and Mr. Kozak came to my room, and Mr. Kozak said that he had sold 3500 shares of Hercules Galion to a customer of his, and the customer had reneged on the purchase, he had no way of canceling the purchase, somebody is going to have to eat this purchase, and I asked again, "Why do you have to come here to tell this to me? I am not interested in it." [15]

But Keller himself had directed Kozak in early February to sell for him and Dr. Weitz some 12,000 shares of Hercules at the market. Kozak agreed for a "fee" of fifty cents a share.

After one meeting at the hospital Kozak, Rolland, and Furla met and decided the time had arrived to salvage something for themselves from the promotion.

[Kozak]
A. . . . After a meeting at the hospital, Mr. Rolland, Mr. Furla and myself went for a sandwich, and we had a conversation about how we were being suckered in and bagged in Hercules Galion.

I said to Mr. Furla and Mr. Rolland that we will never be able to exercise our option on the stock, the difference of the stock we had promised Mr. Geier and Mr. Peltz the additional 6,000 shares, because there was just no possible way the stock could go to $16 with all the selling in it.

So I said to them, "Let's try to get some money out of this thing, and then just play it by ear the rest of the way." [16]

The salvage operation consisted of falsely telling Projansky that they, Rolland, Furla, and Kozak, needed an additional $50,000 to pay the New York group. Projansky assented to the request; he raised the money by selling 4,500 shares of Hercules stock that he owned jointly with Taub and a friend. The amount actually given to the three was $47,000, in small bills. The three took the money to Furla's home where they divided it equally among themselves. That same day, Rolland paid Nagorsky $5,500 for his efforts in the promotion.

The crushing blow that dashed all hopes for the promotion's revival came on March 7, 1966. The volatile Georges got into a heated argument with Geier and as a result placed an order to sell all of his 8,000 shares of Hercules at the market.

[Kozak]
A. Mr. Georges was in my office on March 7 or March 8, 1966, and he was having a phone conversation with a Mr. Michael Geier.

. . . . . .

The Witness: I heard Mr. Georges yelling at somebody on the phone and threatening that if there was not some buying being made in a stock called Amico—

. . . . . .

—that he would, in turn, sell out his complete position of Hercules Galion. Mr. Georges kept yelling on the phone and then finally handed me the phone, picked up another phone and called up Mr. Zafe Zafer and told him to sell 8000 shares of Hercules Galion stock at the market.

I said to Mr. Geier that Georges is going crazy, he is selling out the stock, he is going to break the market. Mr. Geier said to me, "Try and stop him." Mr. Peltz said to me, who was on an extension, "Try and stop him." [17]

15. *Id.* at 4488, 4489 (Keller).

16. *Id.* at 3092 (Kozak).

17. *Id.* at 3115–16 (Kozak).

The sale precipitated such a drop in Hercules that trading in the stock was suspended.

One final meeting was held, arranged by Geier, at the International Hotel at JFK on Sunday, March 13, 1966. It was attended by about 20 brokers, including Rolland and Kozak from Chicago. At the meeting Geier asked everyone to coordinate their buying. A poll was taken to determine the number of shares controlled by the brokers present. The total came to two-thirds of the Hercules stock outstanding, an obvious impossibility. For example, Geier and Peltz themselves claimed to have purchased 170,000 shares when in fact they had bought only 41,900 shares. Having failed to revive the team spirit, the team disbanded. None of the attendants purchased any Hercules thereafter.

## II. Proffered Grounds For Reversal

### A. *Sufficiency and Scope of the Conspiracy*

 Brainin, Leavitt, and Geier contend that the evidence is insufficient to link them with the conspiracy to raise the price of Hercules stock. The contention is baseless. The evidence of the

appellants' partnership in the agreement to promote the price of Hercules is overwhelming. Their contentions are variously based on the mistaken premise that conspirators cannot be convicted in federal courts on the basis of the testimony of accomplices [18] or that one conspirator must know all other conspirators and their acts in furtherance of the conspiracy in order to be charged as a member of the conspiracy.[19]

Appellants' contention that the evidence showed three conspiracies rather than one is likewise without merit. The evidence is clear that the appellants were each engaged in a scheme to raise the price of Hercules by manipulation and to hold the stock at the artificially raised price for a period of six months. From the spring 1965 meetings to the final attempt to rescue the promotion at the International Hotel at JFK, the promoters were committed to a common goal and their acts were all in furtherance of this common goal.[20]

### B. *Objections to the Charge*

 Appellants marshal a battery of objections to Judge Lasker's charge to the jury. We consider only those to which a proper objection was made.[21]

---

18. *But see* Caminetti v. United States, 242 U.S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442 (1917) ; United States v. Phillips, 426 F.2d 1069, 1071 (2d Cir.), cert. denied, 400 U.S. 843, 91 S.Ct. 86, 27 L.Ed.2d 78 (1970).

19. *But see* Blumenthal v. United States, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947) (". . . the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others." (footnote omitted)) ; United States v. Vega, 458 F.2d 1234 (2d Cir. 1972) ; United States v. Agueci, 310 F.2d 817, 826 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). *See also* Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

Appellant Brainin points to Keller's desire, evident in his testimony, to depose

Brainin from his position of influence at Hercules. We fail to see how this "subconspiracy" detracts from the case against Brainin.

20. *See* Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) ; United States v. Calabro, 449 F.2d 885, 892–893 (2d Cir. 1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 728, 30 L.Ed.2d 735 (1972) ; United States v. Borelli, 336 F.2d 376, 382–387 (2d Cir. 1964), cert. denied, Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965) ; United States v. Falcone, 109 F.2d 579, 581 (2d Cir.), aff'd, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940).

21. Fed.R.Crim.P. 30; United States v. Lewis, 140 U.S.App.D.C. 40, 433 F.2d 1146, 1152 (1970) (per curiam) ; United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965) (en banc), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966).

First, appellants complain of Judge Lasker's reference to the "unwarranted" hopes for leniency in sentencing of those defendants who testified for the government at the trial.[22] Their argument is that this purported misstatement undermined the defense theory that the cooperating witnesses were selling out the defendants in the hope of reduced sentences on their pleas of guilty. The argument is without substance. The charge read in context clearly informed the members of the jury that *they* were to assess the credibility of the witnesses and that in so assessing *they* should

evaluate the weight to be given to the defendants' contention concerning the credibility of the government's witnesses.[23]

Appellants further object to the court's charge on the weight to be given to an admitted perjurer's testimony.[24] Keller admitted at trial that he had committed perjury before the grand jury. The court instructed the jury in reference to this admission that whether his testimony *at trial* was credible was solely their decision. Moreover, the court charged the jury that it should examine an accomplice's testimony with care.[25] We do not find any error in this charge.

Appellants complain that the court's charge on accomplice testimony did not sufficiently emphasize the suspicion with which such testimony should be considered and that in charging on accomplice testimony the court implied that it had concluded a conspiracy had in fact been proved. The court's charge on accomplice testimony, see note 25 *infra*, was correct, United States v. Bellamy, 436 F.2d 542, 545–546 (2d Cir.), cert. denied, 402 U.S. 929, 91 S.Ct. 1523, 28 L.Ed.2d 862 (1971) ; United States v. Mattio, 388 F.2d 368, 370 (2d Cir.), cert. denied, 390 U.S. 1043, 88 S.Ct. 1643, 20 L.Ed.2d 305 (1968) ; United States v. Kelly, 349 F.2d 720, 767–768 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966) ; United States v. Vita, 294 F.2d 524, 526 (2d Cir. 1961), cert. denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962), and is a fortiori not reviewable, even though not objected to, as plain error under Fed.R.Crim.P. 52(b).

22. I want to say that the power of sentence in this Court is reposed in the Judges, and only in the Judges, and the United States Attorney and Assistant United States Attorneys have no power whatever with respect to the sentence. In saying this, however, I do not wish to suggest what weight should be given to the defense argument that a human being may color his testimony in the hope that some Judge may give him recognition for such cooperation, if such it can be called. You should consider this matter in your assessment of the credibility of these witnesses. As you did with other witnesses, you must ask yourselves, is he telling the truth? In the case of the witnesses I am talking about, have they colored their testimony in the unwarranted hope that

they can secure more favorable treatment? This is for you and you alone to decide.
Transcript at 9404–05.

23. *See generally* United States v. Kahaner, 317 F.2d 459, 479 (2d Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963).

24. As to the witnesses who have admitted lying to the grand jury or otherwise in the past you should consider their testimony and decide whether you wish to accept or reject it in whole or in part. You may decide, for example, that an admitted liar is unbelievable, or, conversely, you may accept his testimony recognizing that in life there are persons who have lied in the past but are not incapable of telling the truth in the present. Again, this is for you and only you to decide.
Transcript at 9405.

25. In the prosecution of crime the Government is often called upon to use witnesses who are accomplices in the commission of the crime itself. This is particularly so in cases of conspiracy. Conspirators do not publicly proclaim their intentions to operate openly. It often happens that only members of the conspiracy have evidence which is relevant to and important in the case.
However, experience has shown that accomplices may be motivated to place the responsibilities on others than themselves. Accordingly, an accomplice's testimony should be closely examined, weighed with care, checked with the facts which you find to exist in this case, and against the evidence which may corroborate them, and then you should give the testimony such

■ Finally, appellants invite us to overrule a phalanx of cases in this circuit holding that once a judge determines that the government has proved by a fair preponderance of the evidence the defendant's participation in a conspiracy independent of hearsay utterances of co-conspirators, the jury may consider *all* evidence in determining whether the de-fendant participated in the conspiracy beyond a reasonable doubt.[26] The basis for this invitation is the contention that the principle of *Bruton* [27] requires that the jury determine a defendant's participation in a conspiracy beyond a reasonable doubt before it consider the hearsay declarations of co-conspirators linking the defendant to the conspiracy.[28]

---

value or weight as you deem important under the circumstances.

In the Federal Courts accomplice testimony by itself may be sufficient to convict if, but only if, it convinces you of the defendant's guilt beyond a reasonable doubt.

It is, of course, proper for you to consider the interest which a witness has in the outcome of a case, whether that witness be a defendant himself, a government witness, or a defense witness. All witnesses are to be judged by the same standards. But in determining the credibility of a witness, his interest in the outcome of the case is certainly a matter you are entitled to take into consideration. I do not mean to suggest that a witness who has an interest in the outcome of the case may not be telling the truth in spite of his interest, but you may consider that factor in determining what weight to give his testimony.

*Id.* at 9403–04.

26. United States v. Cafaro, 455 F.2d 323, 326 (2d Cir. 1972) ; United States v. Pordum, 451 F.2d 1015, 1016–1017 (2d Cir. 1971) (per curiam), cert. denied, 405 U.S. 998, 92 S.Ct. 1249, 31 L.Ed.2d 467 (1972) ; United States v. Calabro, 449 F.2d 885, 889 (2d Cir. 1971), cert. denied, 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed. 2d 801 (1972) ; United States v. Jacobs, 431 F.2d 754, 760–761 (2d Cir. 1970), cert. denied, 402 U.S. 950, 91 S.Ct. 1613, 29 L.Ed.2d 120 (1971) ; United States v. Calarco, 424 F.2d 657, 660 (2d Cir.), cert. denied, 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 53 (1970) ; United States v. Eskow, 422 F.2d 1060, 1069–1070 (2d Cir.), cert. denied, 398 U.S. 959, 90 S.Ct. 2174, 26 L.Ed.2d 544 (1970) ; United States v. Baker, 419 F.2d 83, 88–89 (2d Cir. 1969), cert. denied, De Norscio v. United States, 397 U.S. 971, 90 S.Ct. 1086, 25 L.Ed.2d 265 (1970) ; United States v. Geaney, 417 F.2d 1116, 1120 (2d Cir. 1969), cert. denied, Lynch v. United States, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970) ; United States v. Nuccio, 373 F.2d 168, 173–174 (2d Cir.), cert. denied, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967) ; United States v. Borelli, 336 F.2d 376, 387 (2d Cir. 1964), cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965) ; United States v. Stadter, 336 F.2d 326, 329–330 (2d Cir. 1964), cert. denied, 380 U.S. 945, 85 S.Ct. 1028, 13 L.Ed.2d 964 (1965) ; United States v. Stromberg, 268 F.2d 256, 265–266 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959) ; United States v. Dennis, 183 F.2d 201, 230–231 (2d Cir. 1950) (dictum), aff'd on other grounds, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) ; United States v. Pugliese, 153 F.2d 497, 500–501 (2d Cir. 1945) ; United States v. Nardone, 127 F.2d 521, 523 (2d Cir.), cert. denied, 316 U.S. 698, 62 S.Ct. 1296, 86 L.Ed. 1767 (1942).

*Accord,* United States v. Bey, 437 F.2d 188, 191–192 (3rd Cir. 1971) ; Carbo v. United States, 314 F.2d 718, 735–738 (9th Cir. 1963), cert. denied, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964).

27. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

28. The effect of the rule [of *Dennis et al.*] is to admit evidence of conversations and statements of fact by people (such as George Georges) who are not called by the Government, and who convict with their un-cross examined utterances. As Judge Dooling pointed out in [his dissent in] *Calarco,* this denial of the right of cross examination approaches the due process point raised in Bruton v. U. S., 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476] (1968). We do claim that this rule deprives the Defendants of due process. Amendment V, United States Constitution. Brief for Appellant Brainin at 44.

Appellants also refer us to the apparent practice in a few of the circuits requiring the jury to determine the defendant's membership in the conspiracy beyond a reasonable doubt based solely on the evidence independent of the co-conspirators' hearsay declarations. *See* Dennis v. United States, 346 F.2d 10, 16 (10th Cir. 1965), rev'd on other grounds, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973

We fail to perceive how *Bruton* affects the *Dennis* rule allocating between judge and jury the initial determination of whether a defendant is a member of the conspiracy for purposes of permitting the declarations of co-conspirators to be considered by the jury in assessing the defendant's guilt. To agree with the appellants would be to nullify the co-conspirator exception to the hearsay rule, a result we do not think was intended in *Bruton*.[29] We therefore decline the appellants' invitation.

## C. *Objection to the Failure to Sever*

 Leavitt and Geier contend that their prosecutions should have been severed from the prosecutions of the other defendants. Whether to grant such a motion is within the sound discretion of the trial judge.[30] Given that the evidence (1) clearly supports the charge of one conspiracy, and (2) that Leavitt and Geier were members of this conspiracy, the contention that the trial judge abused his discretion in failing to sever fails a fortiori.

## D. *Alleged Errors in the Prosecutor's Summation*

 Appellant Leavitt objects to portions of the prosecutor's summation. Specifically, he objects to the prosecutor's argument inferring from the testimony that when Leavitt met with Projansky and Keller during the spring of 1965 Leavitt told them that his brother-in-law, Rolland, could help them raise the price of Hercules stock.[31] Even if improper, we fail to see how this inference of the prosecutor's constitutes prejudicial error. The evidence of Leavitt's participation in the conspiracy is substantial and, given that the test of such errors is whether their commission denied the defendant a fair trial,[32] the supposed improper inference constitutes at worst a harmless error.

 Leavitt also complains about the prosecutor's affixing the date of Septem-

(1966) ; Newman v. United States, 331 F.2d 968, 971 (8th Cir. 1964), cert. denied, 379 U.S. 975, 85 S.Ct. 672, 13 L.Ed. 2d 566 (1965) ; Landers v. United States, 304 F.2d 577, 582 (5th Cir. 1962). The issue was not really analyzed in these cases ; to the extent that it was, we find their analyses unpersuasive in light of the arguments of Judge Learned Hand in United States v. Dennis, 183 F.2d 201, 230–231 (2d Cir. 1950), aff'd on other grounds, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) and Judge Merrill in Carbo v. United States, 314 F.2d 718, 735–738 (9th Cir. 1963), cert. denied, 377 U.S. 953, 84 S.Ct. 1626, 12 L.Ed.2d 498 (1964).

29. Particularly in light of the narrowing of *Bruton* evident in Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) and California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 48 (1970). *See* Davenport, The Confrontation Clause and the Co-Conspirator Exception In Criminal Prosecutions: A Functional Analysis, 85 Harv.L.Rev. 1378, 1379–81 (1972).

30. Fed.R.Crim.P. 14; Stilson v. United States, 250 U.S. 583, 585–586, 40 S.Ct. 28, 63 L.Ed. 1154 (1919) ; United States v. Vega, 458 F.2d 1234, 1236 (2d Cir. 1972) ; United States v. Borelli, 435 F.2d 500, 502 (2d Cir. 1970), cert. denied, 401 U.S. 946, 92 S.Ct. 963, 28 L.Ed. 2d 229 (1971).

31. Now, in the spring of '65 Gerald Leavitt meets with Irving Projansky and Arthur Keller at the First National Bank of Lincolnwood. They discuss Hercules Galion. Irving Projansky told Leavitt that he was unhappy with what was happening with the Hercules Galion stock. So what does Gerald Leavitt say? He says, "I got a brother-in-law. His name is Rolland. He can really help you out with the price of the stock. He can really get Hercules Galion up in price." Transcript at 9139. An objection was made to this portion of the prosecutor's summation. *Id.* at 9203.

32. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 239–240, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) ; United States v. D'Anna, 450 F.2d 1201, 1205–1206 (2d Cir. 1971) ; United States v. Dibrizzi, 393 F.2d 642, 646 (2d Cir. 1968) ; United States v. DeAlesandro, 361 F.2d 694, 696–697 (2d Cir.), cert. denied, 385 U.S. 842, 87 S.Ct. 94, 17 L.Ed.2d 74 (1966) ; United States v. Angelet, 231 F.2d 190, 192 (2d Cir.), cert. denied, 351 U.S. 952, 76 S.Ct. 849, 100 L.Ed. 1476 (1956).

ber 9th to the third Argus meeting, rather than September 1st, which latter date Leavitt claims his counsel and the prosecutor had agreed to throughout the trial. We again fail to see the prejudice flowing from this alleged breach of agreement by the prosecution: the evidence is substantial that Leavitt joined and acted in furtherance of the conspiracy before and after September 9th and/or September 1st.

### E. The Lower Court's Refusal to Grant A Motion For Change of Venue

Appellants complain of two judges' failure to grant their motions made before and at the beginning of the trial for a change of venue to Chicago. The motion was first denied by Judge Frankel, but without prejudice to renew should events so warrant before trial. The motion was renewed before Judge Lasker. He carefully considered the motion and concluded that the events that had transpired between the time of the motion before Judge Frankel and the time of the motion before him did not warrant a different response.

Lower court judges have wide discretion in disposing of change of venue motions.[33] If the court applies the proper criteria the exercise of that discretion is rarely disturbed on appeal. In denying the motion Judge Lasker explicitly applied the nine criteria approved for testing change of venue motions in *Platt*.[34] We perceive no abuse of discretion in his application of these criteria.

### F. Judge Lasker's Ruling on Peremptory Challenges

Before trial the defendants made various motions. During this session Judge Lasker informed counsel present that he had decided to grant the defendants 16 peremptory challenges and the government 8.[35] One of the defendants' coun-

---

33. Platt v. Minnesota Mining & Mfg. Co., 376 U.S. 240, 245, 84 S.Ct. 769, 11 L.Ed. 2d 674 (1964); Wagner v. United States, 416 F.2d 558, 561–562 (9th Cir. 1969), cert. denied, 397 U.S. 923, 1015, 90 S.Ct. 915, 25 L.Ed.2d 104 (1970); United States v. Aronson, 319 F.2d 48, 52 (2d Cir.), cert. denied, 375 U.S. 920, 84 S.Ct. 264, 11 L.Ed.2d 164 (1963). *See generally* Jones v. Gasch, 131 U.S.App.D.C. 254, 404 F.2d 1231 (1967), cert. denied, 390 U.S. 1029, 88 S.Ct. 1414, 20 L.Ed. 2d 286 (1968).

34. Applying this table of measurement [the criteria of *Platt*, 376 U.S. at 243–244, 84 S.Ct. 769, 11 L.Ed.2d 674] to the case at hand, I find that:

 (1) There are apparently six Chicago defendants and four New York defendants. Counsel on both sides indicates that there may be a plea of guilty by one defendant from each city, but of course the mere possibility of the pleas is too tenuous to affect the situation. The present ratio of Chicago to New York defendants is not sufficient to grant the motion and is no different from what it apparently was at the time of Judge Frankel's decision, in spite of his statement that the number of defendants was then evenly divided between the two cities.

 (2) The witnesses appear to be evenly divided between the two cities.

 (3) The events in issue were well distributed between Chicago and New York.

 (4) The documents and records likely to be involved, although possibly evenly divided between the cities in the past, have now been largely collected and located in New York.

 (5) The business of a Chicagoan standing trial in New York will undoubtedly be disturbed to some extent if trial occurs in New York, but this would be equally true of New York defendants in the event of a Chicago trial.

 (6) Chicago defendants will undoubtedly incur expense by being required to be present in New York, as would New York defendants if required to be present in Chicago.

 (7) By far the greater number of counsel on both sides are located in New York.

 (8) Both forums are equally accessible as a place for trial.

 (9) The docket conditions in both courts are substantially equivalent, but in any event the case has already been scheduled for trial in the Southern District of New York to commence the first week of January, 1970.

35. The Court: Gentlemen, before I am overwhelmed by your motions and forget what I wanted to tell you myself, I would like to make a few announcements.

sel responded shortly thereafter as follows:

Mr. Londin: With respect to your Honor's ruling as to peremptory challenges, of course there is a valid reason for the defendants requesting and receiving additional peremptories above and beyond what the statute requires. There are eight defendants on trial and sixteen peremptories comes out to two peremptories per defendant. The converse of that as to the government, I don't say it applies at all. There is no valid reason for the government to require or to obtain additional challenges. They are still one party plaintiff to this case.

The Court: I haven't given them very many more, Mr. Londin. Two more. There is logic to what you are saying, but I think in the choice—I don't think that the only issue here is the actual number of defendants. I think it is an important case and that it is reasonable that where so many challenges are exercised on one side, a recognition be given to some extent as far as the other side is concerned.

Mr. Londin: I did wish to point out that the government alleges a community of interest among the defendants. The defendants, by their plea of not guilty, have denied that. I think it is appropriate for us to have obtained additional peremptories, but as far as the government is concerned and for the record I would respectfully except to the government's obtaining additional peremptories.

The Court: I think our bigger problem will be finding jurors to last as long as they need to.[36]

Appellants now claim that the grant to the government violated Rule 24(b) of the Criminal Rules, and that, while prejudice cannot be shown, their convictions must be reversed if the Rule is not to be nullified. Rule 24(b) provides:

. . . If the offense charged is punishable by imprisonment for more than one year, the government is entitled to 6 peremptory challenges and the defendant or defendants jointly to 10 peremptory challenges. . . . If there is more than one defendant, the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly.

█ We do not consider the merits of appellants' contention because the issue was not presented to the court below so as to preserve the question for review here.[37] While defendants did note their objection to the grant by Judge Lasker of eight peremptories to the government, they did not urge upon the court the ground that they forcefully argue here, namely, that Rule 24(b) simply does not grant to district court judges the same discretion in permitting extra peremptories to the government as it does in permitting extra peremptories to defendants. Our reading of the relevant portion of the transcript convinces us that Judge Lasker was not made aware of the ground for the defendants' objection that is now urged on appeal. The thrust of the defendants' objection below was that whereas there were several defendants there was only one plaintiff, the government, and therefore the reason for granting extra peremptories to the defense did not exist for granting extra peremptories to the prosecution. No mention was made of the argument that Rule 24(b) grants no discretion to a district court to give the government extra peremptories. Because of this, and concluding that in the absence of a show-

---

I have determined as far as jury challenges are concerned, there will be 16 challenges for the defendants and 8 for the government on the regular jurors, and as to the alternates—and I propose to pick six alternates because we have accommodations for them and a long case—6 challenges for the defendants and 3 for the government. Transcript at 47.

36. *Id.* at 54–55.

37. See Fed.R.Crim.P. 51; United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965) (en banc), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966).

ing of prejudice the claimed error does not affect "substantial rights," [38] we decline to decide the merits of this claim.

We have considered all other grounds for reversal urged upon us and find them to be without merit.

The judgments of conviction are affirmed.

**38.** *Accord,* New England Enterprises, Inc. v. United States, 400 F.2d 58, 68 n. 6 (1st Cir. 1968), cert. denied, 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969). See United States v. Silverman, 449 F.2d 1341, 1344 (2d Cir. 1971), cert. denied, 405 U.S. 918, 92 S.Ct. 943, 30 L. Ed.2d 788 (1972) ; United States v. Potts, 420 F.2d 964, 964–965 (4th Cir.) (per curiam), cert. denied, 398 U.S. 941, 90 S.Ct. 1855, 26 L.Ed.2d 276 (1970) ; Krause v. Chartier, 406 F.2d 898, 901 (1st Cir. 1968), cert. denied, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 749 (1969).